IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 3, 2005 Session

## CLAY MANLEY v. THE AUTOMOBILE INSURANCE COMPANY OF HARTFORD, CONNECTICUT

**Direct Appeal from the Circuit Court for Davidson County**
**No. 00C-624     Carol Soloman, Judge**

---

**No. M2003-02654-COA-R3-CV - Filed April 22, 2005**

---

This appeal arises from a claim for homeowner's insurance benefits. In 1998, a tornado damaged a home in East Nashville. The owner of the home held an insurance policy that provided coverage for guaranteed replacement cost above the policy limit, once repairs had been completed. After the insurer had paid the owner the actual cash value of the damage, the owner sold the home to the plaintiff for $80,000. Along with the sale, the owner assigned to the plaintiff the rights to any claims or proceeds under the insurance policy. The plaintiff, without making any repairs, began a process of attempting to collect supplemental proceeds under the policy. After the insurer failed to respond to the plaintiff's demand for an appraisal, the plaintiff submitted two sworn statements in proof of loss, claiming a total of $405,072.93 in replacement costs. The insurer rejected the plaintiff's proofs of loss, and this suit followed. Following a jury trial, the trial court entered judgment in favor of the plaintiff for $405,072.93, in addition to $35,000 in damages for bad faith. Because we find that the judgment entered by the trial court was the product of an inconsistent jury verdict, we vacate and remand.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Vacated; and Remanded**

DAVID R. FARMER, J., delivered the opinion of the court, in which ALAN E. HIGHERS, J. and HOLLY M. KIRBY, J., joined.

Arthur E. McClellan, Gallatin, Tennessee, for the appellant, The Automobile Insurance Company of Hartford, Connecticut.

John R. Jacobson and William D. Martin, Nashville, Tennessee, and Taylor A. Cates, Memphis, Tennessee, for the appellee, Clay Manley.

**OPINION**

### I. FACTS AND PROCEDURAL BACKGROUND

On April 16, 1998, a tornado passed through Nashville, Tennessee damaging a home owned by Robert and Mary Faye Holt (collectively the "Holts"), located at 1715 Eastland Avenue in East Nashville. The Holts maintained a homeowners' insurance policy (the "Policy") for their residence (the "Property") with the Appellant, The Automobile Insurance Company of Hartford, Connecticut ("Hartford"). Although the Policy provided a coverage limit of $93,000 for the "dwelling," the Policy also contained a "Home Replacement Cost Guarantee" endorsement,[1] which allowed the insured to recover the full amount required to repair or replace the loss, once repairs were completed.

Soon after the tornado struck, the Holts retained a public insurance adjuster, Phil Breeden & Associates ("Breeden"), to assist them in the preparation and presentation of their claim to Hartford. By letter dated April 27, 1998, Breeden notified Hartford that the Holts had retained Breeden and requested that Hartford direct further correspondence directly to him. Included with the letter was a "Notice of Loss," accompanied by a "Public Adjusters Notice and Loss Payable Endorsement."[2] On July 23, 1998, in what represented the actual cash value payment of the Holts' loss, Hartford issued two checks to the Holts. One check in the amount of $15,149.59 represented the personal property loss, and a check in the amount of $34,544.07 represented the damage to the dwelling. Hartford did not obtain a full release under the policy as a condition for these payments. Although Hartford issued a $34,544.07 check for the depreciated value of the property damage, Breeden stated in his testimony that he and Hartford negotiated replacement costs of $40,946.40. In its letter which accompanied the actual cash value payment to the Holts, Hartford stated that depreciation was recoverable upon completion of repairs and presentation of receipts. Besides replacing windows and covering the damaged roof with a tarp, the Holts never made any substantial repairs to the Property.

---

[1] In a letter attached to the Policy, the Holts' local insurance agent explained the "Home Replacement Cost Guarantee" as follows:

> You have chosen to insure your home for its full replacement costs. You're covered if your home is completely destroyed by any covered loss (even if the cost to rebuild is greater than the amount of Coverage A shown on your policy). For more information and your obligations, please refer to this endorsement in your policy.

In summary, the Home Replacement Cost Guarantee provided that Hartford would pay no more than the actual cash value of the damage, which represents the depreciated value of the property, until actual repair or replacement was complete. Once repair was complete, Hartford would pay no more than the smaller of the following: (1) the replacement cost, without deduction for depreciation of all or part of the dwelling with the same type of construction and like kind and quality materials at the same location; or (2) the amount actually and necessarily spent to repair or replace the damaged building.

[2] The "Public Adjusters Notice" served to notify Hartford that Breeden was representing the Holts and requested Hartford to direct all correspondence to Breeden, rather than the Holts. The "Loss Payable Endorsement" directed Hartford to include Breeden's name on all payments issued in conjunction with the claim.

During the summer of 1998, the Appellee, Clay Manley ("Mr. Manley"), approached Mr. Holt and spoke with him about representing the Holts with their insurance claim on the Property. At the time, Mr. Manley was a principal in Howarth, Keys & Manley, Inc. ("HKM"), a firm of public insurance adjusters. Mr. Holt informed Mr. Manley that the Holts were not interested in his services because the Holts had retained Breeden to assist them with their claim. At some point thereafter, the Holts contacted a real estate agent about selling the Property. Mr. Manley then expressed interest in purchasing the Property, and Mr. Holt quoted him a selling price of $60,000. After reviewing the Policy and discovering that it provided guaranteed replacement cost coverage, Mr. Manley offered Mr. Holt $80,000 for the Property. On August 12, 1998, Mr. Manley and the Holts entered into an "as is" contract for the sale of the Property with a purchase price of $80,000. In a separate document (the "Assignment") executed along with the sale, the Holts assigned to Manley their rights and interests to any claims or proceeds under the Policy. Closing took place on August 28, 1998, and the Holts conveyed the Property by warranty deed to Mr. Manley.

Shortly after he purchased the Property, Mr. Manley enlisted HKM to represent him in making a supplemental claim on the Policy. By letter dated September 1, 1998 and an attached "appraisal notice," HKM notified Hartford that Mr. Manley was "invok[ing] the appraisal provision of the policy."[3] In the September 1, 1998 letter, HKM also made the following request:

> Your insured has requested that I immediately ask you to issue payment for the amount, which you have offered them on this loss, which represents the undisputed portion of the claim. Please forward payment directly to your insured immediately, inasmuch as they need the funds to continue to mitigate their damages and to pay for some of the numerous expenses they have incurred since the date of the loss.

This letter marks the first correspondence between Mr. Manley and Hartford related to the Property. Prior to this point in time, the parties had not communicated regarding the Property, and, consequently, there had been no disputes regarding any amount of loss. Hartford apparently neither acknowledged Mr. Manley's demand to invoke the "appraisal provision" of the Policy, nor did it "issue payment for the amount, . . . which represent[ed] the undisputed portion of the claim."

---

[3] The "appraisal provision" of the Policy provides as follows:

If you and we fail to agree on the amount of loss, either one can demand that the amount of loss be set by appraisal. If either makes a written demand for appraisal, each shall select a competent, independent appraiser and notify the other of the appraiser's identity within 20 days of receipt of the written demand. The two appraisers shall then select a competent, impartial umpire. If the two appraisers are unable to agree upon an umpire within 15 days, you or we can ask a judge of a court of record in the state where the residence premises is located to select an umpire. The appraisers shall then set the amount of loss. If the appraisers submit a written report of an agreement to us, the amount agreed upon shall be the amount of loss. If the appraisers fail to agree within a reasonable time, they shall submit their differences to the umpire. Written agreement signed by any of two of the three shall set the amount of loss. Each appraiser shall be paid by the party selecting the appraiser. Other expenses of the appraisal and the compensation of the umpire shall be paid equally by you and us.

Having received no response from Hartford, on October 6, 1998, HKM submitted two Sworn Statements in Proof of Loss ("Proof(s) of Loss") to Hartford, one for physical property damage and another for loss of rental use. In the Proof of Loss for the "Dwelling and APS only," Mr. Manley attested that the Property had sustained damage in the amount of $383,472.93. Attached to the Proof of Loss for the Property, HKM included an itemized, room-by-room estimate of the damage, prepared by an adjuster who did not work for HKM. In the Proof of Loss submitted for loss of rental use, Mr. Manley claimed the loss of the fair rental value of the Property for one year in the estimated amount of $21,600. Interestingly, on October 6, 1998, in addition to submitting the two Proofs of Loss, Mr. Manley entered into an agreement that granted HKM an option to purchase the Property for the sum of ten ($10) dollars. However, just prior to the trial in this case, on April 21, 2003, Mr. Manley sold the Property to Michael L. Lajoie for $110,000. Throughout the time he owned the Property during the course of this dispute, Mr. Manley never made repairs to the Property.

On December 3, 1998, Hartford notified Mr. Manley in writing that it was rejecting both Proofs of Loss because they failed to comply with the terms and conditions of the Policy, in as much as the Proofs of Loss were not sworn to by the named insureds, i.e. the Holts. Hartford further asserted that it had "fully compromised and settled" the claim by paying the Holts the sum of $34,644.07. Additionally, the letter noted that Mr. Manley had misstated the amount of coverage under the Policy, and Mr. Manley was not the owner of the Property on the date of the loss in question.

On December 3, 1998, the same day that Hartford rejected Mr. Manley's Proofs of Loss, Hartford mailed, by certified mail with return receipt requested, a letter addressed to the Holts at their former address, 1715 Eastland Avenue. In this letter, Hartford invited the Holts to file a supplemental claim and return the attached blank Proof of Loss in accordance with the terms and conditions of the Policy. On March 3, 1999, after the Holts had not returned a completed Proof of Loss, Hartford mailed another letter, also by certified mail with return receipt requested, addressed to the Holts at the 1715 Eastland Avenue address. In this second letter, Hartford informed the Holts that they had failed to comply with the conditions provided under the Policy for filing a supplemental claim, and, therefore, Hartford was taking the position that "any and all supplemental claims you may have had . . . are herein denied." The record reflects signed return receipts for both of these letters, however, neither of the signatures are legible, and the printed name below the signatures appears to read "P. Potter."

After voluntarily dismissing the initial action brought in chancery court, Mr. Manley filed a second complaint against Hartford in Davidson County Circuit Court on March 1, 2000. In his complaint, Mr. Manley sought to enforce the arbitration and appraisal provision of the policy and averred that Hartford's refusal to participate in the appraisal process was in bad faith. Hartford subsequently filed its answer denying that it owed any obligation to Mr. Manley under the Policy. After the trial court denied Mr. Manley's motion for partial summary judgment, Mr. Manley filed his Rule 56.05 Motion For Entry of Findings. On December 17, 2002, the trial court entered an order granting in part Mr. Manley's motion. In that order, which purportedly narrowed the issues for trial, the trial court entered the following findings:

1. Defendant did not settle this claim upon its payment to the original insureds, Mr. and Mrs. Robert Holt;

2. The amount set forth in Plaintiff's Proofs of Loss ($405, 072.93) is determined to be an accurate estimate of the amount of loss[;]

3. The primary issues remaining in this case are (1) whether Mr. Manley is the proper party to bring a supplemental claim against the policy at issue in this case . . .; and (2) if Mr. Manley is determined to be the proper party, the timing of the payment [Hartford] must make to Mr. Manley.

Subsequently, Hartford filed a motion to alter or amend, asserting that the foregoing order was totally erroneous in that it set forth findings that were never discussed. By agreed order entered February 24, 2003, a jury trial was set for June 16, 2003, and the issues raised in Hartford's motion to alter or amend were to be resolved by mutual agreement. However, if counsel for the parties were unable to resolve the dispute, the agreed order provided that each would submit opposing briefs on the disputed issues prior to the pre-trial conference, set for June 5, 2003, and the matter would be resolved by the trial court at the pre-trial conference.

At the pre-trial conference, counsel for Hartford stated to the trial court that the issues raised in its motion to alter or amend, including the issue of damages, had not been resolved. The trial court, however, refused to entertain argument on these issues and ordered that the amount of damages was set at $405,072.93. Just prior to trial, Hartford filed several motions, all of which were denied by the trial court as being untimely filed.[4]

Following a two day jury trial, the jury returned its "Jury Verdict Form," which responded to a set of special interrogatories as follows:

**QUESTION 1:** Was the Automobile Insurance Company required to pay Clay Manley's supplemental claim?

Yes **X**                No ___

_____If your answer to Question 1 is "No," then you have found for the Automobile Insurance Company and you should sign this form on the last page and return it to the court. If your answer to Question 1 is "Yes," then please answer Question 2.

---

[4]It appears from the record that counsel for Hartford sent three motions by Federal Express overnight delivery on June 12, 2003. However, the motions were not delivered and filed until the day of trial, June 16, 2003, after the trial had begun. Therefore, the motions were not before the court when counsel attempted to argue the motions immediately prior to trial.

**QUESTION 2:** Was the Automobile Insurance Company required to pay Clay Manley the amount set forth in the proof of loss before the repairs were made to the property or were they allowed to wait until after the repairs had been completed to pay the cost of repairs?

**_____ Required to pay BEFORE repairs were made to property**
**_X_ Required to pay only AFTER the repairs were completed**

If your answer to Question 2 is "Before," then you should skip directly to Question 4.  If your answer to Question 2 is "After," please answer Question 3.

**QUESTION 3:** Did the Automobile Insurance Company waive any right it may have had to require Mr. Manley to make repairs to the property before it paid the claim?

**Yes ___                     No _X_**

*If your answer to Question 3 is "No," then you have found for the Automobile Insurance Company, and you should sign this form on the last page and return it to the court.*  (emphasis added).  If your answer to Question 3 is "Yes," please answer Question 4.

**QUESTION 4:** Did the Automobile Insurance Company engage in unfair or deceptive acts or practices toward Clay Manley by refusing to pay for the cost of repairs?

**Yes _X_                     No ___**

If your answer to Question 4 is "No," then please skip directly to Question 7.  If your answer to Question 4 is "Yes," then please answer Question 5.

**QUESTION 5:** Did Clay Manley suffer damages as a result of the Automobile Insurance Company's unfair or deceptive acts or practices?

**Yes ___                     No _X_**

If your answer to Question 5 is "No," then skip directly to Question 7.  If your answer to Question 5 is "Yes," then please answer Question 6.

**QUESTION 6:** What amount, if any, is Clay Manley entitled to recover from the Automobile Insurance Company as damages resulting from the Automobile Insurance Company's unfair or deceptive acts or practices?

**ANSWER: $_____**

Please answer Question 7.

**QUESTION 7:** Was the Automobile Insurance Company's failure to pay Clay Manley for his loss done in bad faith?

**Yes  X**                    **No**

If your answer to Question 7 is "No," you should sign this form on the last page and return it to the court.  If your answer to Question 7 is "Yes," then please answer Question 8.

**QUESTION 8:** Did the Automobile Insurance Company's failure to pay cause additional expense, loss, or injury, including attorney fees upon Clay Manley?

**Yes  X**                    **No**

If your answer to Question 8 is "No," then you should sign this form on the last page and return it to the court.  If your answer to Question 8 is "Yes," then please answer Question 9.

**QUESTION 9:** What amount, if any, is Clay Manley entitled to recover from the Automobile Insurance Company as damages for their bad-faith refusal to pay the amount of Mr. Manley's loss?  *This amount cannot exceed 25% of the amount of loss, which is $101,268.23*.

**ANSWER: $ 35,000.00**

On July 2, 2003, the trial court entered an order awarding Mr. Manley $405,072.93 in damages for Hartford's breach of contract and $35,000 in damages for bad faith.  Subsequently, the trial court awarded Mr. Manley $185,558.56 in prejudgment interest and $2,918.75 in discretionary costs.  Hartford filed a motion for new trial on July 31, 2003 and an amended motion for new trial on September 17, 2003.  The trial court denied both motions, and Hartford timely filed its notice of appeal.

## II. ISSUES

On appeal, Hartford raises twelve issues:

(1)     Whether the trial court erred in not entering a judgment in favor of [Hartford];

(2)     Whether the trial court erred in entering a judgment against [Hartford] for statutory bad faith;

(3)     Whether the trial court erred in determining general damages as a matter of law and entering a judgment thereon;

(4)     Whether the trial court's misconduct during the trial demands a new trial;

(5)     Whether the trial court erred in not hearing and not granting [Hartford's] Rule 56 motion for summary judgment;

(6)     Whether the trial court erred in denying [Hartford's] motion for a dismissal at the conclusion of Manley's case in chief and at the end of the trial;

(7)     Whether the trial court erred in granting Manley's motion to dismiss [Hartford's] counter complaint;

(8)     Whether the trial court erred in not permitting [Hartford] to amend its affirmative defenses;

(9)     Whether the trial court erred in not permitting [Hartford] to use party depositions, party interrogatories and photographs in its case in chief;

(10)    Whether the trial court erred in ruling Phil Breeden was not an indispensable party and/or in failing to dismiss;

(11)    Whether the trial court erred in ruling, as a matter of law, that no settlement/accord and satisfaction took place and in failing to charge that defense; and

(12)    Whether the trial court erred in instructing the jury.

### III. DISCUSSION

At the outset of its argument that the trial court erred in not entering judgment in its favor, Hartford contests the validity of the Assignment between the Holts and Mr. Manley. In this case, the Policy contained an anti-assignment clause, which prohibited the assignment of the Policy without the consent of Hartford. Hartford essentially concedes that, despite an anti-assignment provision, Tennessee law allows for an insured to assign the cause of action or proceeds payable under an insurance policy, where the underlying loss that gives rise to the insurer's liability has previously occurred. *See Ford v. Robertson*, 739 S.W.2d 3, 5 (Tenn. Ct. App. 1987). However, Hartford argues that, although the proceeds of the contract may be assignable, the contractual duties and conditions between the insurer, Hartford, and the named insureds, the Holts, are not assignable. Hartford contends that, despite the Assignment, the duty of the insured to meet the conditions for coverage continued. Thus, in this case, Hartford argues that, because the Holts failed to file a

-8-

supplemental claim or comply with the conditions for further payment, such as completing repairs, Hartford was not under a duty to pay either the Holts or Mr. Manley.

We believe it is fairly well-settled that, in Tennessee, an insured may assign an insurance policy *after* a loss has occurred, despite an anti-assignment clause purportedly prohibiting assignments without the consent of the insurer. *Zaharius v. Vassis*, 789 S.W.2d 906, 910 (Tenn. Ct. App. 1989); *Ford*, 739 S.W.2d at 5; *Metro. Life Ins. Co. v. Brown*, 160 S.W.2d 434, 437–38 (Tenn. Ct. App. 1941). However, the assignee of the policy "stands in the shoes" of the assignor and receives nothing more than what the assignor held. *See Zaharius*, 789 S.W.2d at 910–11. Although, in this case, the Assignment was valid, Mr. Manley was still bound to meet the conditions for coverage that existed under the Policy.

Turning now to the judgment entered on the jury verdict, it is necessary to detail some of the events that transpired while the jury was deliberating. During its deliberations, the jury twice announced that it was deadlocked, apparently as a result of "Question 3" of the verdict form. Over Hartford's objection and request for a mistrial, the trial court instructed the jury to proceed with the rest of the special interrogatories and return to "Question 3" later. Accordingly, the record reflects that the jury proceeded to answer the remaining questions, which involved Mr. Manley's Tennessee Consumer Protection Act and bad faith claims. In looking at the verdict form, the instruction which follows "Question 3" clearly states that a "No" answer should lead to a finding for Hartford. The instruction further provides that, if the jury answered "No" to "Question 3," then it should sign the form and return it to the court without answering the remaining questions. Here, the jury answered "No" to "Question 3." However, guided by the trial court's instructions, the jury proceeded to answer the remaining questions and, in doing so, we believe, reached an inconsistent verdict. Illustrative of its confusion, upon reading its verdict in open court and after answering "No" to "Question 3," the jury foreperson asked the trial court, "do I continue," to which the trial court responded, "Yes."

In the case of *Concrete Spaces, Inc. v. Sender*, 2 S.W.3d 901 (Tenn. 1999), the Tennessee Supreme Court restated the law regarding defective verdicts:

> Tennessee law is well-established that litigants are entitled to have their rights settled by a consistent and intelligible verdict and that verdicts that are inconsistent and irreconcilable cannot stand. *See Milliken v. Smith*, 218 Tenn. 665, 668, 405 S.W.2d 475, 476 (1966); *Alabama Highway Express, Inc. v. Luster*, 51 Tenn.App. 691, 696, 371 S.W.2d 182, 183 (1963); *Penley v. Glover*, 30 Tenn.App. 289, 292, 205 S.W.2d 757, 759 (1947). Where a judgment is based upon inconsistent findings by a jury it is the duty of the appellate court to reverse and remand the case for a new trial. [*See McInturff v. White*, 565 S.W.2d 478, 482]; *Berry v. Foster*, 199 Tenn. 352, 356, 287 S.W.2d 16, 18 (1955); *Penley*, 30 Tenn.App. at 292, 205 S.W.2d at 759.

> A new trial is also warranted when verdict forms are composed in such a faulty fashion that they do not address each of the plaintiffs' theories of recovery and

do not allow the jury to adequately respond to each claim. Well-settled law requires courts to construe the terms of a verdict in a manner that upholds the jury's findings, if it is able to do so. *See Briscoe v. Allison*, 200 Tenn. 115, 125–26, 290 S.W.2d 864, 868 (1956). Even if a verdict is defective in form, it is to be enforced if it sufficiently defines an issue in such a way as to enable the court to intelligently articulate a judgment. *See Arcata Graphics Co. v. Heidelberg Harris, Inc.*, 874 S.W.2d 15, 22, 27 (Tenn. App.1993).

*Id.* at 911.

After reviewing the verdict in this case, we can see no way that the trial court could have intelligently articulated a judgment therefrom. Although Question "2" involves the interpretation of the insurance policy and is, therefore, a question of law, *State ex rel. Pope v. U.S. Fire Ins. Co.*, 145 S.W.3d 529, 533 (Tenn. 2004), we believe that the jury correctly decided Question "2" in favor of Hartford. The insurance policy at issue here provides a "Home Replacement Cost Guarantee," but the Policy is clear that the insurer is not under a duty to pay until *after* repairs have been completed. In this case, it is undisputed that Mr. Manley never made the first repair, and the jury reflected this finding in its verdict. Additionally, in answering "No" to Question "3," the jury found that Hartford had not waived any right it may have had to require Mr. Manley to make repairs before it paid the claim. This finding is supported by the record as well, as there is nothing in the record to suggest otherwise. Therefore, we believe that, at the point the jury answered "No" to "Question 3," its job was finished. However, because the jury was instructed to complete the remaining interrogatories, it reached an internally inconsistent result. In the remainder of its verdict, the jury found that Hartford had engaged in unfair or deceptive practices by refusing to pay for the cost of repairs, but Mr. Manley had suffered no damages as a result. Finally, the jury found that, despite its finding that Hartford was not obligated to pay until after Mr. Manley had completed repairs, Hartford's failure to pay was done in bad faith. The jury then awarded Mr. Manley $35,000 in bad faith damages. Here, the jury's findings — that Hartford was, on one hand, not required to pay the loss but, at the same time, acting in bad faith in failing to pay — are irreconcilable.

We do not believe that, in rendering a judgment for Mr. Manley, the trial court intended to ignore the jury's findings with regard to its answer to "Question 3." Rather, from a review of the record, it is apparent that there was considerable confusion among all parties throughout the course of this trial, which led to the inconsistent verdict. As such, we are of the opinion that the verdict from which the trial court entered its judgment was fatally defective, and the trial court's judgment rendered thereupon is likewise invalid. Accordingly, we vacate the judgment of the trial court and remand this matter for a new trial.

In view of the foregoing conclusion, it would generally be unnecessary for us to address the remaining issues presented by Hartford, as they would be pretermitted. However, we feel it is important to address the issue of damages in this case in order to clarify this issue for purposes of remand. As previously mentioned, during the pre-trial conference, the trial court ruled that Hartford would not be allowed to contest the amount of damages at trial. Although it is certainly not clear

from the record exactly how the trial court arrived at this determination, we will nevertheless make an attempt to interpret the proceedings below.

In his complaint, Mr. Manley never actually sought general damages, but rather sought to enforce the appraisal provision of the Policy. In October of 2000, he filed a motion for summary judgment, which was denied on November 12, 2002. Two days later, Mr. Manley filed a motion that sought the entry of undisputed facts, and a hearing on this motion for the entry of findings was scheduled to be heard on December 6, 2002. Exactly what took place on December 6, 2002 is not clear, as there is no transcript and the record reflects that the attorneys for the respective parties have conflicting accounts as to what was determined in that "hearing."[5] Regardless, on December 17, 2002, the trial court entered an order, which, among other things, established that "[t]he amount set forth in [Mr. Manley's] Proofs of Loss ($405,072.93) [was] determined to be an accurate estimate of the amount of loss." Following the entry of this order, Hartford filed a motion to alter or amend the order, arguing that the order was completely erroneous and set forth findings that had never been discussed. Hartford's motion was heard on February 7, 2003, and by an agreed order entered February 24, 2003, it was established that, among other things:

> the issues raised in [Hartford's] Motion to Alter and Amend shall be discussed by the parties in an effort to resolve the disputes. However, in the event the disputes cannot be resolved by the mutual agreement of the parties, [the parties shall submit briefs to the Court on all unresolved issues before the pre-trial conference]. All matters not otherwise resolved by agreement shall be resolved and determined by the Court at the Pre Trial Conference which is scheduled for the 5th day of June, 2003.

When counsel for the parties appeared at the pre-trial conference, it was clear that the parties had not reached any agreement that settled the amount of damages. Notwithstanding Hartford's position, the trial court ruled that the amount of damages set forth in its December 17, 2002, order was the law of the case, and damages were no longer at issue for purposes of the trial. At the pre-trial conference, counsel for Hartford and the trial court had the following exchange regarding the issue of damages:

> THE COURT: . . . . So, it looks like from that order the issues are pretty clear. Do you have any - - do you want to respond to that?
>
> ATTORNEY: Well, damages is one of the issues. The damages was never resolved and has not been resolved.

---

[5]Counsel for Hartford insists that, although argument on Mr. Manley's motion was scheduled for December 6, 2002, the argument did not occur. Rather, when the case was called, the trial judge asked both attorneys to retire to her chambers. At that point, counsel for Hartford contends that the trial judge and the attorneys merely discussed the future handling of the case, and there was no argument or ruling on Mr. Manley's motion for entry of findings.

THE COURT: Not the - - the amount is clear, it's just if the damages are owed, if that amount is owed.

ATTORNEY: No, ma'am, I disagree with that.

THE COURT: You can disagree all day long, that's what the order says.

ATTORNEY: You're ordering - -

THE COURT: That the jury will determine if they're entitled to anything, and at what value, is it before or after repair - - do they have to repair it to get it. But the amount is not in dispute. It's just are those the damages?

ATTORNEY: That's my point, Your Honor, the amount is in dispute.

THE COURT: Well then, we'll grant you an appeal at the end, but my judgment stands. . . .

In his brief to this Court, Mr. Manley cites to *Bard's Apparel Mfg., Inc. v. Bituminous Fire & Marine Ins. Co.*, 849 F.2d 245, 249 (6th Cir. 1988) for the proposition that, by refusing to participate in the appraisal process throughout the course of this litigation, Hartford has waived its right to contest the amount of the alleged loss. *Bard's Apparel* and the other cases cited by Mr. Manley are clearly distinguishable from this case for a number of reasons. In *Bard's Apparel*, the insurer and the insured had spent months in open negotiations over the adjustment of the loss. *Bard's Apparel*, 849 F.2d at 249. It was only after the insured gave notice of its intention to file suit that the insurer attempted to invoke the appraisal process. *Id.* In the policy at issue in *Bard's Apparel*, an appraisal was a *condition precedent* to filing suit. *Id.* (emphasis added). The Court of Appeals for the Sixth Circuit agreed with the district court and concluded that, under the circumstances, the insurance company "not only waived its right to an appraisal *as a condition precedent to suit*, but also waited an unreasonable length of time to the prejudice of Bard's before demanding an appraisal." *Id.* (emphasis added). In the present case, the facts are completely reverse to those in *Bard's Apparel*. Here, the insured sought to invoke the appraisal provision at the outset of his involvement with the insurer, long before there was any dispute or disagreement over the amount of a loss. Moreover, the appraisal provision under the Policy in this case does not operate as a condition precedent to suit. Therefore, we conclude that *Bard's Apparel* and the other cases cited by Mr. Manley are not applicable to the facts of this case.

After a thorough review of the record, we believe that the trial court erroneously set damages as a matter of law in the amount estimated in Mr. Manley's Proofs of Loss. The record reflects that Hartford contested the trial court's rulings on this matter, but, for some reason not wholly apparent from the record, Hartford's pleas were to no avail. The issue of damages in this case is a disputed, factual issue that is material to the ultimate outcome of the case. Accordingly, we conclude that it was error for the trial court to summarily determine that the amount of damages was not in dispute.

-12-

Finally, we wish to address the trial court's *ex parte* communication with the jury. Because of the trial court's order setting damages, there was little evidence of damages presented at trial.[6] The jury was instructed that the amount of damages had been set pursuant to the trial court's December 17, 2002 order. Evidently, this establishment of damages concerned the jury. During its deliberations, the jury specifically asked the trial court to change its ruling, and the trial court and the jury discussed the issue of damages outside the presence of the parties or their attorneys. During the deliberations, the trial court stated for the record the following *ex parte* communication, which took place between the trial court and the jury:

> The jury asked me if the damage award is set in stone. And I said, Yes, it was. And they said, Could you change it? I said, I'm the only person that can change it. Anything is a possibility. Just resolve this case and then leave that to us. So, I wanted you to know that I said that, which is really strange.
> They came back and said they were hopelessly deadlocked. . . .

Certainly, *ex parte* communication between the trial court and the jury is not favored. *Holt v. Parton*, No. E2000-02695-COA-R3-CV, 2001 WL 987230, at *8 (Tenn. Ct. App. Aug. 29, 2001) (*no perm. app. filed*). As the *Holt* court explained, however, every *ex parte* communication between the trial judge and the jury is not reversible error. *Id.* at *8 (citing *Spencer v. A-1 Crane Servs.*, 880 S.W.2d 938, 941 (Tenn. 1994)). However, "reversal is required where a *timely* complaining party shows specific prejudice or where, owing to the nature of the *ex parte* communication, the reviewing court is unable to determine whether the action was actually harmless." *Id.* (emphasis in original) (quoting *Spencer*, 880 S.W.2d at 941). In this case, we cannot make a determination from the record whether the jury was influenced by the trial court's response to its question regarding changing the amount of damages. Therefore, we are unable "to determine whether the action was actually harmless." *Spencer*, 880 S.W.2d at 942. Thus, taken in combination with the confusing nature of the verdict form and the trial court's instructions to complete the interrogatories despite a finding that Hartford was not required to pay Mr. Manley, we conclude that the *ex parte* communications constitute reversible error.

## IV. CONCLUSION

For the foregoing reasons, we vacate the judgment of the trial court and remand this matter for further proceedings consistent with this opinion. Costs of this appeal are taxed to the Appellee, Clay Manley, for which execution may issue if necessary.

_____
DAVID R. FARMER, JUDGE

---

[6] Although the trial court's order eliminated damages as a contested issue, on two separate occasions during trial, witnesses testified indirectly that the replacement cost for the Property would fall in the range of approximately $30,000 to $41,000.