IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 23, 2006 Session

**THERESA GODBEE v. ROBERT M. DIMICK, M.D.**

**Appeal from the Circuit Court for Davidson County**
**No. 01C-548      Barbara Haynes, Judge**

_____

**No. M2005-01299-COA-R3-CV - Filed on September 11, 2006**

_____

Patient filed a medical malpractice claim against an orthopedic surgeon for his alleged negligence in her diagnosis and spinal surgery. After a three week trial, the jury rendered a verdict in favor of the physician. The patient appealed, claiming that she was entitled to a new trial because the trial court erred with regard to several evidentiary rulings, its communications with the jurors, its jury instructions and verdict form, and its decision to permit the jury to examine medical articles used in cross-examination. We have determined that the judgment must be reversed and the case remanded for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed and Remanded**

WILLIAM B. CAIN, J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., and FRANK G. CLEMENT, JR., J., joined.

Joe Bednarz, Sr., Karen M. Weimar, Nashville, Tennessee; Steven R. Walker, Memphis, Tennessee, for the appellant, Theresa Godbee.

Michael F. Jameson, Renee Levay Stewart, Nashville, Tennessee, for the appellee, Robert M. Dimick, M.D.

**OPINION**

On October 11, 1994, Ms. Theresa Godbee saw her family physician, Dr. Ben Shelton, complaining of back pain. Over the course of three visits, he prescribed Ms. Godbee anti-inflammatories, an injection of Depo-Medrol, oral steroid pills and bed rest. Due to her continued pain, Dr. Shelton referred Ms. Godbee to Dr. Robert Dimick, an orthopedic surgeon. On November 1, 1994, Ms. Godbee saw Dr. Dimick, complaining of back pain and pain in her right leg which had recently spread to her left leg.

Dr. Dimick treated Ms. Godbee's back pain for over a month with no improvement using non-surgical methods. Dr. Dimick thereafter scheduled Ms. Godbee for a partial laminectomy on December 6, 1994, in order to alleviate her left and central disc herniations. Dr. Dimick alleged that he independently reviewed the lumbar spine MRI performed by Dr. Michael Metzman on November 1, 1994, and that he determined that there was no indication of spinal stenosis, a condition described as an especially narrow spinal canal.

During the surgery on December 6, 1994, Dr. Dimick entered from Ms. Godbee's asymptomatic left side in order to remove the left and central disc herniations. However after surgery, Ms. Godbee's condition did not improve. On December 6, 1994, Dr. Dimick ordered another lumbar spine MRI which according to Plaintiff' expert physician, revealed stenosis of the spinal canal and compression of the thecal sac. Dr. Dimick asserted that the presence of Gelfoam, a sponge-like material used by surgeons to control bleeding, caused a post-operative mis-diagnosis of spinal stenosis.

On December 14, 1994, Dr. Dimick performed a bilateral laminectomy on Ms. Godbee. However after that surgery, Ms. Godbee was diagnosed with arachnoiditis, a hyper-inflammation of the nerve roots, which she claims was caused by the failure of Dr. Dimick to take special precaution when performing spinal surgery on a patient with spinal stenosis. Dr. Dimick claimed that Ms. Godbee's arachnoiditis pre-dated her surgeries and was caused by her massive pre-surgical disc herniations.

Ms. Godbee underwent a spinal fusion surgery by Drs. Schoettle and Berklacich five months later. On December 6, 1995, Ms. Godbee filed a medical malpractice action against Dr. Dimick claiming that he was negligent in failing to recognize Ms. Godbee's spinal stenosis, in performing inappropriate and inadequate surgery and that his negligence caused injury to Plaintiff including the condition known as arachnoiditis. Ms. Godbee's complaint also named Dr. Metzman however, an agreed order was entered on March 12, 1996, granting summary judgment in favor of Dr. Metzman and dismissing all claims against him. On February 22, 2000, Ms. Godbee entered an order of voluntary non-suit and dismissal.

On February 21, 2001, Ms. Godbee filed a new complaint alleging that Dr. Dimick failed to properly evaluate and assess Ms. Godbee's medical condition, to take appropriate actions in order to safely operate on a patient with spinal stenosis in order to avoid nerve damage and that Dr. Dimick's negligence was the cause of her injuries. The case was tried before a jury from January 10, 2005, until January 26, 2005. On February 8, 2005, the jury rendered a verdict in favor of Dr. Dimick. On March 9, 2005, Ms. Godbee filed a motion for a new trial however, the trial court denied the motion on May 6, 2005. Ms. Godbee appealed.

On appeal, Ms. Godbee contends that the trial court erred in (1) engaging in *ex parte* communications with the jury; (2) allowing Defendant to submit two medical articles into evidence; (3) refusing to allow Dr. Schlachter to rebut Dr. Dimick's testimony; (4) giving inapplicable, erroneous and incomplete instructions to the jury and constructing the jury verdict form in an

erroneous and incomplete manner; (5) finding that the jury's verdict was not contrary to the weight of the evidence; (6) admitting an open opinion letter from Dr. Landman; and (7) excluding portions of Dr. Schoettle's video deposition. Defendant asserts in his cross-appeal that Plaintiff's claim should be barred under the doctrine of estoppel and unclean hands.

## I. *EX PARTE* COMMUNICATIONS WITH JURY

The first issue raised by Ms. Godbee on appeal concerns the trial court's *ex parte* communications with the jury. During deliberations, the jury sent four pages of questions to the trial court which the court answered *ex parte*. Specifically, Ms. Godbee argues that two questions in particular which were answered by the court constituted reversible error:

> Q. Could we replace the word "cause" in question #2 with "contributing factor"?[1]
>
> A. No.
>
> Q. [C]an [Dr. Dimick] be partially negligent due to Dr. Metzman's involvement?
>
> A. No.

Ms. Godbee asserts that the jury's questions plainly show that the jury was confused as to whether they could find Dr. Dimick liable if they believed that Dr. Metzman's reading of the MRI also contributed to Ms. Godbee's injuries. Based on the court's responses to the jury's questions, Ms. Godbee claims that the jury may have incorrectly believed that if Dr. Metzman was partially liable for Plaintiff's injuries, then they could not find Dr. Dimick liable.

Generally, a trial court's communications with a jury in a civil case does not require reversal *per se*. *Guy v. Vieth*, 754 S.W.2d 601, 605 (Tenn.1988).

> The recent case of *Life from the Sea, Inc. v. Livy*, 502 So.2d 473, 474 (Fla.App.1987), summarized the current status of the law.
>
> The overwhelming weight of authority, which we choose to follow, is that where a trial judge's *ex parte* communication with a jury in a civil case does not affect any substantial rights of the parties, the error will be deemed harmless. A complaining party thus must demonstrate specific prejudice, which might include a showing of an inability of the reviewing court to determine from the record whether the action was actually harmless. *Loatman v. Patillo*, 401 A.2d 91 (Del.1979); *Beck v. Wessel*, 90 S.D. 107, 237 N.W.2d 905 (1976) (affirming a judgment where the jury has asked the trial judge if he

---

[1] Question 2 on the jury verdict form asked, "Was Dr. Robert Dimick's negligence a proximate cause of injury or damage to Theresa Godbee which would not have otherwise occurred?"

could give them certain information and he responded "no"). *See also Nelson v. Hydraulic Press Mfg. Co.*, 84 Ill.App.3d 41, 39 Ill. Dec. 422, 404 N.E.2d 1013 (App.2d Dist.1980) (moving party must demonstrate specific prejudice before a jury verdict will be set aside as a result of an unauthorized communication with the jury); *Fordyce v. Hansen*, 198 Mont. 344, 646 P.2d 519 (1982) (the ultimate inquiry is whether the irregularity affected the substantial right of the party).

. . .

The best position seems to us to be that a trial judge's *ex parte* communication with a jury in a civil case does not require reversal per se, but reversal is required where a *timely* complaining party shows specific prejudice or where, owing to the nature of the *ex parte* communication, the reviewing court is unable to determine whether the action was actually harmless. *See Andrews v. O'Hearn*, 387 N.W.2d 716 (N.D.1986); *Hernandez v. Charles E. Virgin, M.D., P.A.*, 505 So.2d 1369 (Fla.App.1987); *Guzzi v. Jersey Central Power & Light Co.*, 36 N.J.Super. 255, 115 A.2d 629 (1955).

*Guy*, 754 S.W.2d at 604-605; *see also Spencer v. A-1 Crane Serv., Inc.*, 880 S.W.2d 938, 941 (Tenn.1994); *Davis v. Hall*, 920 S.W.2d 213, 216 (Tenn.Ct.App.1995).

While communications between the trial court and the jury are always of concern on appeal, there is nothing in this case that establishes prejudice under *Guy* and we find no reversible error.

## II. SUBMISSION OF MEDICAL ARTICLES

Ms. Godbee next contends that the trial court erred in admitting into evidence two medical articles supplied by Defendant and allowing the jury access to the articles during deliberations. During cross-examination of Plaintiff's expert, Dr. Kenneth Smith, Defendant questioned Dr. Smith about an article which he had co-authored. Despite Plaintiff's objection, the trial court allowed Dr. Smith's article to be passed to the jury and later entered as an exhibit along with a second medical article authored by Dr. Smith's colleagues, Drs. McCulloch and Young. Plaintiff objected to the admission of the articles as exhibits to be given to the jury.

MR. BEDNARZ:     Judge, on these articles, I assume they are for identification only? They should not be an exhibit that can go back to the jury because they –
THE COURT:     I believe that we just passed it to the jury because Dr. Smith identified his –
MS. STEWART:     Actually both.
THE COURT:     Yeah, and the other two were his colleagues, I believe. He called them extremely reliable.

-4-

MR. BEDNARZ:    You honor, it is my understanding that literature that is used to cross-examine a witness cannot be made an exhibit and go back to the jury room.
MR. JAMESON:    Unless identified as reliable according to 611.
THE COURT:    This is the court's experience that any time an article is identified as a learned treatise and someone gives credence to it, if a copy is made, I send it to the jury. I don't think they'll read it, Mr. Bednarz.
MR. BEDNARZ:    That is the reason I'm objecting.

The use made of Exhibits 5 and 8 in the presence of the jury in the cross-examination of Dr. Smith is of little significance. It is the decision of the trial court over the objections of Plaintiff to allow these two documents to be received as substantive evidence and delivered as exhibits to the jury for use in their deliberations that is critical.

The Tennessee Rules of Evidence differ from the Federal Rules of Evidence relative to this question in two critical and material areas. Tennessee Rule of Evidence 618, dealing with impeachment of experts by learned treatises provides that such documents "may be used to impeach the expert witness' credibility but may not be received as substantive evidence."

No such comparable rule exists in the Federal Rules of Evidence. Federal Rule of Evidence 803(18) provides:

> **(18): Learned Treatises.** To the extent called to the attention of an expert witness upon cross-examination or relied upon by the expert witness in direct examination, statements contained in published treaties, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice. If admitted, the statements may be read into evidence but may not be received as exhibits.

Tennessee has no similar rule of evidence.

Prolonged discussion of whether or not under Federal Rules of Evidence such learned treatises are admissible as substantive evidence is not warranted in this case since the critical issue is not the in-court use of Exhibits 5 and 8 as impeachment material but rather the admission of these documents as substantive evidence under Tennessee law compounded by the submission of those two exhibits to the jury for use in the jury room during their deliberations. Long before the adoption of either the Federal Rules of Evidence or the Tennessee Rules of Evidence the latter practice found little favor. As far back as *Crisman v. McMurray*, 107 Tenn. 469, 64 S.W. 711, 712-13 (Tenn.1901) the Court, quoting from the early sentences of Demosthenes on the Crown, pointed out how documents in the hands of the jury during deliberations may be given undue weight by the jury. This Court has held:

Finally, on the question of whether the plaintiff's deposition should have gone to the jury room, the defendant relies upon T.R.C.P. 32.02 which states that the deposition of a party may be used by an adverse party for any purpose. While it is clear under T.R.C.P. 32.02 that a deposition of the adverse party may be used for any purpose at trial, that is no *carte blanche* for the proposition that it may be used by the jury in its deliberations.

The court in *Sinard v. Harris*, 2 Higgins 486 (Tenn.App.1911), dealt with written statements made by a party. The trial court refused to allow the jury to take all of the written evidence offered at trial with them when they retired to consider their verdict. The court held that where part of the evidence is oral and part written, it is improper for the written evidence, or any part of it, to be taken into the jury room for use by the jury in its deliberation. *Id.* at 495. In explaining the rationale for its holding, the court said:

> To permit such course would be, as many courts point out, and as noted by the authorities already cited, to permit an undue advantage on behalf of the party who has introduced the writing so taken. As pointed out by our Supreme Court in the excerpt of *Crisman v. McMurray*(23 Pickle 469), hereinbefore set out, it is natural that the jury should give to such writings taken out with it "more probative force than their recollection" of what had been said orally, or, as said in a note found on page 478 of Abbott's Civil Trial Briefs, the reason for withholding such writings from the jury where part of the evidence has been oral is, "that the testimony which they contain if read and reread by the jury would otherwise have an unfair advantage over the oral testimony by speaking to the jury more than once." *Id.* at 469.

We believe the reasoning regarding "unfair advantage" espoused in *Sinard v. Harris, supra*, is as sound today as it was then.

*Fletcher v. Coffee County Farmers Co-op*, 618 S.W.2d 490, 495 (Tenn.Ct.App.1981) (footnote omitted).

Tennessee Rule of Evidence 618, as it relates to the use of learned treatises in cross-examination of an expert for the purpose of testing credibility, is but declaratory of pre-existing common law, *Sale v. Eichberg*, 105 Tenn. 333, 59 S.W. 1020, 1025 (Tenn.1900), except for the last proviso thereof, making it clear that such learned treatises "may not be received as substantive evidence."

While Tennessee has never adopted that which appears as Federal Rule of Evidence 803(18), an advisory commission comment to Tennessee Rule of Evidence 803 provides, "Learned treatises

can be used to impeach an expert, but are not themselves admissible to prove the truth of their contents. No good reason exists to permit hearsay to be taken as true just because it is written in books. F.R.Evid. 803(18) is contra."

This comment can be misleading if it is not restricted to what it is actually saying. Federal Rule of Evidence 803(18) is "contra" only to the extent that the federal rule allows such learned treatises to be used as substantive evidence. The last sentence of Federal Rule of Evidence 803(18) makes clear however that while statements from learned treatises may be read into evidence, they "may not received as exhibits."

The meaning of the last sentence of Federal Rule of Evidence 803(18) is carefully explained by the authorities.

> Views of recognized authorities, expressed in treatises, pamphlets or periodicals written for professional colleagues, may be employed on cross-examination of an expert witness to impeach provided the author's competency is established by an admission of the expert witness, by other expert testimony, or by judicial notice. Moreover, under Rule 803(18) such statements employed to impeach may also be received as substantive evidence. Statements in established reliable authorities may also be admitted for the truth of their content when reasonably relied upon by an expert witness upon direct examination.
>
> . . .
>
> A safeguard against jury misuse of the published authority is found in the final sentence of Rule 803(18) which provides that statements may be read into evidence but shall not be taken to the jury room. This provision attempts to prevent jurors from overvaluing the written word and from roaming at large through the treatise thereby forming conclusions not subjected to expert explanation and assistance. In addition, statements in published authorities are admissible only under circumstances in which an expert is testifying. Whether relied upon in support of direct examination or raised on cross-examination, an expert witness will have an opportunity to evaluate and explain to the trier of fact how the statement contained in the learned treatise relates to the issues that they are to decide.

30B Michael H. Graham, *Federal Practice and Procedure* § 7059 (interim ed. 2000).

Saltzburg, Martin & Capra observe:

> Rule 803(18) provides that when a learned treatise is admitted, it is read into evidence but it cannot be received as an exhibit. Statements from learned treatises receive treatment similar to prior recollection recorded. This is to ensure that the

evidence, which is simply a testimonial substitute, is not given more weight than actual trial testimony.

Stephen A. Saltzburg, Michael M. Martin & Daniel J. Capra, *Federal Rules of Evidence Manual*, § 803.02(19)(b) (8th ed. 2002).

In this same section (803.02(19)(b)), Saltzburg, Martin & Capra make it clear that this last sentence of Federal Rule of Evidence 803(18) was not adopted without serious consideration of an opposite approach. The conclusion of the advisory commission in its April 2000 meeting, however, prevailed:

> Judge Shadur and other members pointed out that the most important reason for the second sentence of the Rule is that learned treatises may be given undue weight if they are admitted as trial exhibits. For example, the jury is not ordinarily permitted to bring the transcript of an expert's testimony into the jury room, because the testimony is not an exhibit. Since learned treatises essentially operate as expert testimony, it would be inappropriate for the jury to be allowed to bring a treatise into the jury room because the treatise might receive more weight than the equivalent expert witness testimony. It might even occur that a learned treatise offered to impeach an expert witness would receive greater attention from the jury than the expert's testimony itself. An even greater danger might be posed by allowing learned treatises to be considered by the jury without the benefit of contemporaneous explanation by an expert.

On balance, the Committee decided that the current rule prohibiting use of a learned treatise as an exhibit was appropriate.

Satzburg, Martin & Capra, *Federal Rule of Evidence Manual*, § 803.02(19)(b).

Since the reasoning of the federal authorities supporting the last sentence of Federal Rule of Evidence 803(18) simply reiterates the longstanding rule in Tennessee evidenced by *Sinard v. Harris*, 2 Higgins 486 (Tenn.App.1911) and reasserted in *Fletcher*, 618 S.W.2d at 495 and *Nix v. State*, 530 S.W.2d 524, 530-31 (Tenn.Ct.Crim.App.1975), which rule is further buttressed by Tennessee Rule of Evidence 618 in its clear restriction of the use of learned treatises, it necessarily follows that it was error for the trial court to allow Exhibits 5 and 8 to be admitted as substantive evidence and submitted to the jury for its use during the course of their deliberations. The fact that the documents may be identified as reliable under Tennessee Rule of Evidence 611 has nothing to do with their submission as exhibits to the jury. *State v. Braden*, 867 S.W.2d 750, 760 (Tenn.Ct.Crim.App.1993). Likewise immaterial is the trial court's observation that "[t]his is the court's experience that anytime an article is identified as a learned treatise and someone gives credence to it, if a copy is made, I send it to the jury. I don't think they'll read it, Mr. Bednarz."

-8-

## III.  REBUTTAL OF DR. SCHLACHTER

Ms. Godbee also challenges the trial court's refusal to allow her to rebut the testimony of Dr. Dimick with her expert, Dr. Schlachter.  During Plaintiff's case in chief, Plaintiff first called her experts, then her lay witnesses, and finally  Dr. Dimick.  When Dr. Dimick testified on cross-examination by his counsel, he asserted that although he entered from the left side of Ms. Godbee's spine, he had the ability to access the right nerve roots through the use of a Murphy Ball probe.  Plaintiff then attempted to call Dr. Schlachter in rebuttal to testify that it was medically impossible to access the right nerve root from the left side with a Murphy Ball probe.  The court refused to allow Dr. Schlachter to rebut Dr. Dimick's assertion, finding that because Dr. Sclachter and Dr. Smith had already testified that accessing the right nerve root from the left was medically impossible any further testimony on the point would be cumulative.  Dr. Schlacter testified:

> Q.    ...But with him not doing the complete decompressive laminectomy, did he violate the standard of care by going into the left side as opposed to the right side?
> A.    By not doing a complete decompressive laminectomy, he certainly violated the standard of care by going into the left side because he had no way to logistically get to the nerve on the right side from the left.
> Q.    Why not?  You need to explain it.
> A.    I couldn't do it.
> Q.    Is there any way that any surgeon –
> A.    No.
> Q.    – could open or operate from the left side to get over and check the roots at L4-L5 on the right side?
> A.    Not in my opinion, no.
> Q.    Tell us why.
> A.    It's logistically impossible to go to the right, go around the nerve sac, go around the back of it, and get to the right side.  I mean, you're basically having to go this way and then go that way the way over here.
>       You know, to get from an opening from here to here, you would have to take everything and move it out of the way. You can't do it.
>       So what happens is you do an inadequate job, and you damage the nerves trying to do it.

Dr. Smith testified:

> Q.    Is there any way that Dr. Dimick could have checked that root from the left in the operation that he performed?
> A.    Not in the first operation, no.  He did at the second operation, but that's what he should have done the first time.
> ...
> Q.    But, Dr. Smith, is it your testimony that Dr. Dimick could not check the contralateral side because there was a large herniated disc that got in the way?

A. Well, I explained to the jury already how he went in, tried to take the disc out, but he actually pushed the disc out against the root. That's what happened.

Q. What I'm asking about, Doctor –

A. There is no way Dr. Dimick did anything like this at the first operation.

Q. What I'm asking, Doctor, is when is it that he would have checked the contralateral nerve root?

A. He didn't ever check it. There's no way to check the opposite nerve root when you're doing a discectomy.

Q. Is that because the disc gets in the way?

A. No.

Q. Why?

A. Because you – you can't see it. You're down inside the disc space. There's no way you can possibly see the other nerve root or anything.

Plaintiff argues however that Dr. Dimick asserted a new theory during his testimony which had gone unaddressed by Plaintiff's experts. Specifically, Dr. Dimick testified that he used a Murphy Ball probe to compress any visual obstructions on the left side in order to reach Ms. Godbee's right side nerve roots. Dr. Dimick testified:

Q. We were discussing this illustration with Dr. Smith from a textbook he identified as authoritative from McCulloch & Young. And do you recall Dr. Smith's comments about the ability to actually check the contralateral side with instrumentation?

A. Yes.

Q. What did he say?

A. That it is a possibility. It's taught in courses. It is taught in books, and it is used in practice.

Q. As I understand it, Dr. Smith's criticism was there was actually more bone from the lamina down here, and you couldn't have used the instrumentation to reach to the contralateral side. Do you recall that?

A. I recall that. I think he's making a mistake. When the classical approach is made to the posterior lateral herniation, you make the opening – the laminotomy over the lateral side.

When you make an approach to remove a centrally herniated disc, the opening in the bone is made greater toward the central part of the spine.

Q. Can you recognize that from the imaging study?

A. Yes.

Q. Show me.

A. This is the imaging study postoperative after the operation that – of Ms. Godbee's spine.

This is the L4-5 disc right here. This is the facet there and the facet there and the opening in the bone there.

This is her left side here; this is her right side here. So if the surgeon is standing here on our left side, he inserts a probe beneath the lamina between the dural sac, and he can access the contralateral right foramen here.

Ms. Godbee contends that because Dr. Schlacter and Dr. Smith's testimony was limited to whether access to the right side nerve roots was medically possible when entering from the patient's left side and because neither doctor specifically addressed the use of a Murphy Ball probe in Ms. Godbee's operation, she was entitled to have an expert rebut Dr. Dimick's assertion.

"'Rebutting evidence' is that which tends to explain or controvert evidence produced by an adverse party." *Cozzolino v. State*, 584 S.W.2d 765, 768 (Tenn.1979). Rebuttal evidence includes "any competent evidence which explains or is in direct reply to, or a contradiction of, material evidence" introduced by an adverse party. *Nease v. State*, 592 S.W.2d 327, 331 (Tenn.Crim.Ct.App.1979). Although the trial court exercises considerable discretion in determining whether or not to admit rebutting evidence, *Wilkerson v. Williams*, 667 S.W.2d 72, 75 (Tenn.Ct.App.1983), we believe that in this case, such discretion was abused.

This Court has observed:

29 Am.Jur.2d *Evidence* § 250 states:[2]

> When the party holding the negative of an issue, who is usually the defendant, has put in his whole case, the party who first put in his evidence may then put in rebutting evidence. Rebutting evidence is that which is given to explain, repel, counteract, or disprove testimony or facts introduced by or on behalf of the adverse party. Such evidence includes not merely evidence which contradicts the witnesses on the opposite side and corroborates those of the party who began, but also, evidence in denial of any affirmative fact which the answering party has endeavoured to prove.

*State ex rel. Comm'r of Dep't of Transp. v. Williams*, 828 S.W.2d 397, 401 (Tenn.Ct.App.1991).

In the case at bar, pretrial statements to the jury by counsel for Defendant described the "Murphy Ball" probe, but no "Murphy Ball" evidence came before the jury until Dr. Dimick presented it in response to questions asked by his attorney.[3]

---

[2] *See* 75 AmJur2d (revised 1994) Trial Section 365 *et seq*.

[3] Plaintiff had attempted to question Dr. Sclachter about the "Murphy Ball" in Plaintiff's case-in-chief, but the court sustained Defendant's objection thereto and instructed the jury to disregard the "Murphy Ball" questions.

The Court of Appeals of Illinois addressed a similar problem in *Hoem v. Zia*, 606 N.E.2d 818 (Ill.App.Ct.1992). Said the court:

> In the present case, the trial court understandably wanted to curb the length of a complicated, two-week trial. In doing so, however, it erroneously restricted Dr. Schoene from testifying in rebuttal to matters that defendants' experts raised *for the first time in their case in chief*. Specifically, the trial court erred by not allowing Dr. Schoene in rebuttal to reestablish the standard of care for pulmonologists and to testify that Dr. Zia and Dr. Arnold breached that standard of care. Defendants' experts had seriously impeached Dr. Fintel, plaintiff's expert, by claiming that the standard of care about which he testified did not apply to the field of medicine at issue in this case. Plaintiff was entitled to rebut this testimony, and the trial court's failure to permit her to do so constitutes an abuse of the court's discretion and error that requires reversal.

> However, defendants argue that the trial court did not err because plaintiff had her chance to present a pulmonologist in her case in chief, but instead made the tactical error of using only a cardiologist. We disagree. The best answer to defendants' "tactical error" claim is that the trial court, by denying defendants' motion for a directed verdict at the close of plaintiff's case, demonstrated that she had not erred in concluding that the testimony of Dr. Fintel, the cardiologist, would suffice to establish her *prima facie* case. Further, only *after* defendants had presented their evidence challenging Dr. Fintel's testimony did the need arise for plaintiff to rebut that testimony through Dr. Schoene. It would be a strange rule indeed that would require a plaintiff to present *all* conceivably relevant evidence in her case in chief — despite her preference not to do so — because she otherwise would be barred from presenting that evidence in rebuttal *in the event* defendants present evidence in their case in chief that plaintiff needs to (and can) rebut. Imposing such a "preemptive strike" rule upon plaintiffs would be counter-productive to the concerns expressed by the trial court in this very case. Such a rule would also be antithetical to the concerns expressed by all involved in our civil justice system about its present costs, wastes, and delays.

*Hoem*, 606 N.E.2d at 830.

Appellee asserts in brief that Appellant could not have been surprised by the "Murphy Ball" issue since it had been disclosed months prior to the trial in discovery. This same assertion was made in the Court of Appeals of Florida in *Heberling v. Fleisher*, 563 So.2d 1086 (Fla.Dist.Ct.App.1990). The *Heberling* case closely parallels the case at bar. The discussion of the issue by the Florida Court of Appeals is enlightening and persuasive.

> During a medical malpractice jury trial, which resulted in a defense verdict, the court below denied the plaintiff's request to call a neurosurgeon as a rebuttal

witness. We reverse. We also hold that the admission of evidence as to the deceased plaintiff's blood alcohol level was, likewise, error.

The defense theory was that the deceased sustained irreversible and inevitably fatal head injuries, regardless of medical diagnosis or treatment, because of the high-speed bridge abutment crash of the fiberglass automobile in which she was a passenger. By contrast, the plaintiff contended that the deceased bled to death because of a negligently treated ruptured spleen.

During the presentation of the defense, evidence and testimony from three doctors was admitted to show that the diffuse axonal brain injuries suffered would have inevitably caused death and that the deceased was brain-dead as a result of the impact. Thereafter, the plaintiff sought to present rebuttal testimony from Doctor Barrett, a listed expert witness and neurosurgeon, who would have disputed that the brain damage was the cause of death. However, the trial court disallowed it on the basis that the rebuttal would be cumulative and should have been presented during the plaintiff's main case.

We begin by agreeing that the admission or exclusion of rebuttal testimony is not normally an abuse of discretion. *Dale v. Ford Motor Co.*, 409 So.2d 232 (Fla. 1st DCA 1982). However, we do not believe that this general rule stands for the proposition that the plaintiff must disprove all anticipated defenses in its main case-that is exactly what rebuttal is supposed to accomplish. *See Buchanan v. State*, 95 Fla. 301, 116 So. 275, 279 (1928); W. Hicks, Trial Handbook for Florida Lawyers § 104 (The Lawyers Co-operative Publishing Co., 2d ed. 1982). In the case at bar, the plaintiff had to meet the initial burden of proof to establish negligent diagnosis or treatment on the part of the defendants. Unarguably, it did that much. The defense posture that in actuality the deceased died from brain injuries suffered in the crash was entirely proper, but we agree that the plaintiff had a right to attempt to rebut it and present evidence that the brain injury was *not* the cause of death. *See Ahearn v. Florida Power and Light Company*, 113 So.2d 751 (Fla. 2d DCA 1959), *quashed on other grounds,* 118 So.2d 21 (Fla.1960). We have reviewed *Rhodes v. Asplundh Tree Expert Co.,* 528 So.2d 459 (Fla. 3d DCA 1988), and agree that in *Rhodes* the rebuttal may well have been cumulative. The rebuttal sub judice was not cumulative, since no evidence of its subject matter had been offered by the plaintiff prior to the presentation by the defense of the brain damage theory.

The defense points out that the plaintiff, by way of depositions, knew perfectly well for over a year before trial that the defense posture would be that brain damage caused the death. However, while this is undeniably true, it is also plain from the record that the question of whether the defense's brain damage evidence would be admissible at trial was hotly contested. The microscopic slides of brain tissue were never actually entered into evidence by the defense and their authenticity and

reliability was a principal bone of contention. In effect, the defense argues that the plaintiff should have opened the door to the brain damage theory when presenting its case in chief and should have discredited that anticipated defense. Yet, the plaintiff hoped to have this same defense excluded from consideration by the jury, and it would have been very poor tactics, under the facts here, to open the very door which it sought to keep shut and locked.

*Heberling*, 563 So.2d at 1086-76.

Thus, it is seen that the determinative question is not what the parties knew prior to trial, but rather what the jury knew from the in-court evidence presented to them.

The proposition that a Murphy Ball probe could be used to access the right side nerve roots from the patient's left side was not raised in the evidence until Dr. Dimick testified. Simply because Plaintiff could have addressed this issue in her case in chief, does not render otherwise proper rebuttal inadmissible. *See Coates v. Thompson*, 666 S.W.2d 69, 76 (Tenn.Ct.App.1983). Clearly, one cannot rebut a proposition that has not yet been advanced. *Cozzolino*, 584 S.W.2d at 768. Therefore, any testimony contradicting Dr. Dimick's theory was not cumulative. Furthermore, once the Murphy Ball theory was squarely brought into issue in testimony before the jury by Dr. Dimick, rebuttal testimony was not only permissible but in all likelihood necessary.

## VI. JURY CHARGE AND VERDICT FORM

Plaintiff also alleges numerous errors in the trial court's jury instruction. Jury charges are reviewed in their entirety in order to determine whether the trial court committed reversible error. *Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 446 (Tenn.1992).

The necessity of jury instructions based on a clear and sound exposition of the law in order for a jury verdict predicated upon those instructions to stand is a long standing principle of Tennessee law. "The parties are entitled to a clear and consistent charge, as well as a correct one, that justice may be reached." *Citizens' Street Railroad Co. v. Shepherd,* 107 Tenn. 444, 64 S.W. 710, 711 (1901). A verdict will be reversed if it can be shown that an instruction contains an inaccurate statement of the law or is confusing and, considering the charge of the court as a whole, that the error was not harmless, i.e. that the instruction more likely than not affected the outcome of the trial. *Cardwell v. Golden,* 621 S.W.2d 774 (Tenn.Ct.App.1981); *Helms v. Weaver,* 770 S.W.2d 552 (Tenn.Ct.App.1989); *Whitsett v. McCort,* No. 46, 1990 WL 123943 at *7 (Tenn.Ct.App. August 28, 1990).

*Bara v. Clarksville Mem'l Health Sys., Inc.*, 104 S.W.3d 1, 3 (Tenn.Ct.App.2002).

A.

First, Plaintiff contends that the trial court erred in instructing the jury to apply a different standard to her expert testimony than to Defendant's expert testimony. The jury charge in question provided:

> Defendants in medical malpractice actions may introduce expert witness testimony to rebut a plaintiff's expert testimony couched in terms of "reasonable medical probability", even though the defendant's expert witness's testimony is couched only in terms of "possibility."

This instruction was inserted in the charge to the jury by special request of Defendant based upon a statement contained in the opinion of this Court in *Hunter v. Ura*, No. M2002-02573-COA-R3-CV, 2003 WL 22438444 (Tenn.Ct.App. Oct. 23, 2003). The statement of this Court in *Hunter* was made in the context of review of a trial court ruling which granted a motion *in limine* to bar testimony by a defendant expert witness couched in terms of "possibility". The *Hunter* case did not concern jury instructions.

*Hunter* and the prior case of *Mitchell v. Ensor*, No. W2001-01683-COA-R3-CV, 2002 WL 31730908 (Tenn.Ct.App. Nov. 18, 2002) relying on *Sakler v. Anesthesiology Assocs., P.S.C.*, 50 S.W.3d 210 (Ky.Ct.App.2001) adopted the statement therein that:

> We conclude that defendants in medical malpractice actions may introduce expert witness testimony to rebut a plaintiff's expert witness testimony couched in terms of 'reasonable medical probability,' even though the defendant's expert witness' testimony is couched only in terms of 'possibility.'

*Hunter*, 2003 WL 22438444, at *23.

The fact that a special request for jury instruction asserts a correct rule of law does not make it proper jury charge material. *Miller v. Choo Choo Partners, LP*, 73 S.W.3d 897, 909 (Tenn.Ct.App.2001); *Bara*, 104 S.W.3d at 8.

None of the cases relied on by this Court in *Hunter*, namely *Mitchell*, *Sakler*, *Wilder v. Eberhart*, 977 F.2d 673 (1st Cir.1992)(*cert. denied*), and *Tzimas v. Coiffures by Michael*, 135 N.H. 498, 606 A.2d 1082 (N.H.1992), had anything to do with the charge to the jury. Each of the cases turned on the admissibility of defendant expert testimony relative to "possible" causes of a plaintiff's injury.

*Hunter* never had anything to do with jury instructions but rather with the admissibility of evidence. The Tennessee Supreme Court in *Hunter v. Ura*, 163 S.W.3d 686 (Tenn.2005) specifically overruled this Court and its reliance on the *Sakler* holding:

-15-

In reaching our conclusion, we necessarily reject the view that Dr. Hays' testimony was admissible as evidence of a "possible" alternative to the plaintiff's theory under *Sakler v. Anesthesiology Assocs., P.S.C.*, 50 S.W.3d 210 (Ky.Ct.App.2001). In *Sakler*, the court stated in part:

> We conclude that defendants in medical malpractice actions may introduce expert testimony to rebut a plaintiff's expert witness testimony couched in terms of "reasonable medical probability," even though the defendant's expert witness's testimony is couched only in terms of "possibility."

*Id.* at 213. The court reasoned that requiring defendants to establish other causes within a reasonable degree of medical probability "would unduly tie a defendant's hands in rebutting a plaintiff's case." *Id.* at 214; *see also Wilder v. Eberhart*, 977 F.2d 673, 676 (1st Cir.1992).

> In our view, the *Sakler* rule is not needed to avoid shifting the burden of proof to the defendants and would instead, if applied literally, allow defendants to use expert testimony as to "possible" theories or causes without satisfying the safeguards in Rules 702 and 703 of the Tennessee Rules of Evidence. These evidentiary rules require a trial court to determine 1) whether expert testimony will substantially assist the trier of fact in determining a fact in issue, and 2) whether the facts and data underlying the testimony indicate a lack of trustworthiness. Tenn.R.Evid. 702, 703. Indeed, expert testimony that a trial court determines is speculative would not "substantially assist" the trier of fact. Nothing in the evidentiary rules or elsewhere exempts defendants from these fundamental evidentiary inquiries.

163 S.W.2d at 703-704.

Appellee asserts before this Court that the instruction was appropriate at the time it was given because the Supreme Court had not yet ruled in the *Hunter* case. Aside from the fact that *Hunter* did not involve jury instructions, the position of Appellee is weakened by the time frame involved. The decision of this intermediate Court in *Hunter* was released on October 28, 2003. Application for permission to appeal to the Supreme Court was granted on March 22, 2004. Argument before the Supreme Court occurred on October 7, 2004. The charge to the jury in this case occurred on January 26, 2005, while the *Hunter* case remained under advisement by the Supreme Court, the decision of that Court not having been issued until March 29, 2005.

It is well to keep in mind that admissibility of evidence presents a question of law addressing itself to the court and not to the jury. *Miller*, 73 S.W.3d at 909. This Court has admonished that admissibility of evidence presents "a gate keeping question of law under which the trial court decides whether or not a doctor's opinion is admissible in evidence. It is not jury charge material and can only lead to confusion." *Bara*, 104 S.W.3d at 8.

-16-

The instruction in the case at bar is much like that in *Bara* wherein we said:

> In the case at bar, in their special request number nine, Defendants and the trial court have taken out of context the phrase "causation in fact is a matter of probability and not possibility, and must be shown to a reasonable degree of medical certainty" as such phrase is used in *White v. Methodist Hospital South*, 844 S.W.2d 642, 648-49 (Tenn.Ct.App.1992); *Kilpatrick v. Bryant*, 868 S.W.2d 594, 602 (Tenn.1993); and *White v. Vanderbilt University*, 21 S.W.3d 215, 232 (Tenn.Ct.App.1999) dealing with the admissibility of expert testimony and converted it into a jury charge which is exactly what *Miller v. Choo Choo Partners, L.P.*, 73 S.W.3d 897 (Tenn.Ct.App.2001) asserts is not proper.

104 S.W.3d at 10.

We therefore find that the trial court's instruction that Defendant's expert needed only rebut the assertion of causation by a medical possibility was an inaccurate statement of the law. We also believe that the error more likely than not affected the outcome of the trial since expert testimony is an essential requirement in all but the most obvious cases involving allegations of medical malpractice. *Ayers v. Rutherford Hosp., Inc.*, 689 S.W.2d 155, 160 (Tenn.Ct.App.1984). It is often the testimony of battling experts which determines the outcome in a medical malpractice action therefore instructing the jury to hold the parties' experts to different standards constituted reversible error.

## B.

The second issue Ms. Godbee raises with respect to the jury instruction concerns the trial court's decision to charge the jury with the doctrine of superceding cause. The trial court charged the jury:

> 1. The harmful effects of the superseding cause must have occurred after the original negligence;
> 2. The superseding cause must not have been brought about by the original negligence;
> 3. The superseding cause must actively work to bring about a result which would not have followed from the original negligence;
> 4. The superseding cause must not have been reasonably foreseen by the original negligent party.

T.P.I. – CIVIL 3.34 – SUPERCEDING CAUSE.

Ms. Godbee claims that there was no proof presented at trial to support the court's instruction on superceding cause since her complaint merely alleged that Dr. Dimick was negligent in failing to recognize her spinal stenosis and in performing the incorrect procedure. However, Ms. Godbee also asserted in her complaint that Dr. Dimick's negligence resulted in the development of

-17-

arachnoiditis and the need for additional corrective medical procedures which exacerbated her arachnoiditis. Dr. Dimick argues that evidence of Ms. Godbee's pre-existing disc degeneration and evidence of subsequently performed tests and procedures including a discogram, a myelogram, and a 1995 fusion procedure, formed the proper foundation for an instruction on superceding cause.

Comparative fault and independent intervening cause are both affirmative defenses under Tennessee Rule of Civil Procedure 8.03. *George v. Alexander*, 931 S.W.2d 517, 527 (Tenn.1996); *Elosiebo v. State of Tennessee*, No. E2003-02941-COA-R3-CV, 2004 WL 2709206, AT *2 (Tenn.Ct.App.Nov. 29, 2004). Defendant properly pleaded both of these affirmative defenses.

One should not approach the issue of superceding cause in this case without first giving careful consideration to the opinion of this Court in *Waste Mgmt., Inc. v. S. Cent. Bell Tel. Co.*, 15 S.W.3d 425 (Tenn.Ct.App.1997). Therein the dramatic metamorphosis occasioned by the development of a modified comparative fault system in Tennessee, *McIntyre v. Balentine*, 833 S.W.2d 52 (Tenn.1992), and the refinement of elements of common law negligence, particularly as it relates to distinguishing between causation-in-fact and proximate cause, *McClenahan v. Cooley*, 806 S.W.2d 767 (Tenn.1991), is carefully considered.

As relates to intervening cause, this Court explained:

> The intervening cause doctrine is a common-law liability shifting device. It provides that a negligent actor will be relieved from liability when a new, independent and unforseen cause intervenes to produce a result that could not have been foreseen. *Glenn v. Conner*, 533 S.W.2d 297, 301-02 (Tenn.1976); *Brown v. City of Kingsport*, 711 S.W.2d 607, 609 (Tenn.Ct.App.1986). The doctrine only applies when (1) the intervening act was sufficient by itself to cause the injury, *Underwood v. Waterslides of Mid-America, Inc.*, 823 S.W.2d 171, 180 (Tenn.Ct.App.1991), (2) the intervening act was not reasonably foreseeable by the negligent actor, *Evridge v. American Honda Motor Co.*, 685 S.W.2d 632, 635 (Tenn.1985), and (3) the intervening act was not a normal response to the original negligent actor's conduct. *McClenahan v. Cooley*, 806 S.W.2d at 775; *Solomon v. Hall*, 767 S.W.2d 158, 161 (Tenn.Ct.App.1988). The customary explanation of the doctrine is that an independent, intervening cause breaks the chain of legal causation between the original actor's conduct and the eventual injury. *McClung v. Delta Square Ltd. Partnership*, 937 S.W.2d 891, 905 (Tenn.1996); *Haynes v. Hamilton County*, 883 S.W.2d 606, 612 (Tenn.1994); *Ford Motor Co. v. Wagoner*, 183 Tenn. 392, 401, 192 S.W.2d 840, 844 (1946).

> The separation of causation in fact from legal causation and the adoption of the comparative fault doctrine have obscured the role and significance of the intervening cause doctrine. Intervening cause appears to relate more to legal causation than to causation in fact because it does not come into play until after causation in fact has been established. *Doe v. Linder Constr. Co.*, 845 S.W.2d 173,

184 (Tenn.1992); Keeton, *supra*, § 44, at 301. The doctrine also appears to have survived the adoption of comparative fault even though other similar liability shifting doctrines such as last clear chance, implied assumption of the risk, and remote contributory negligence have been subsumed into comparative fault.

*Waste Mgmt., Inc.*, 15 S.W.3d at 432.

A superceding cause is not limited to negligent acts of third parties.

A superceding cause is an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about.

Restatement (Second) of Torts, § 440 (1965); W. Page Keeton, Dan B. Dobbs, Robert E. Keeton & David G. Owens, *Prosser and Keeton on Torts*, § 44 (5th ed.1984).

Any relationship between comparative negligence and intervening or superceding cause necessarily is limited to an analysis of negligence without regard to such "other force" which would involve forces of nature or other forces not based upon negligence. It was in recognition of this fact that the Supreme Court of New Mexico limited the scope of its investigation in *Torres v. El Paso Electric Co.*, 987 P.2d 386 (N.M.1999). By footnote, that Court observed:

Due to the broad scope of the doctrine of independent intervening cause, we expressly limit our analysis of its relationship to comparative negligence to those negligent acts or omissions by a third party or the plaintiff that are causes in fact of the plaintiff's injury; our analysis does not extend to intentional tortious or criminal acts or forces of nature.

987 P.2d at 392 n.2.

While the superseding cause doctrine, and particularly its use in jury instructions, appears to be moving ever closer to a merger into proximate causation, *Waste Mgmt., Inc.*, 15 S.W.3d 425; *Chamberland v. Roswell Osteopathic Clinic, Inc.*, 27 P.3d 1019 (N.M.Ct.App.2001), it still retains its separate identity in most jurisdictions that have adopted a comparative fault system.

There is nothing internally inconsistent in a system that apportions damages based upon comparative fault only among tortfeasors whose actions were proximate causes of an injury. Nor is there any repugnancy between the superseding cause doctrine, which is one facet of the proximate causation requirement, and a comparative fault method of allocating damages. As Professor Schoenbaum has said:
"The doctrine of superseding cause is . . . applied where the defendant's negligence in fact substantially contributed to the plaintiff's injury, but the injury was actually brought about by a later

-19-

cause of independent origin that was not foreseeable. It is properly applied in admiralty cases.

". . . [T]he superseding cause doctrine can be reconciled with comparative negligence. Superseding cause operates to cut off the liability of an admittedly negligent defendant, and there is properly no apportionment of comparative fault where there is an absence of proximate causation." 1 T. Schoenbaum, Admiralty and Maritime Law § 5–3, pp. 165-166 (2d ed.1994).

Indeed, the HIRI respondents assert that of the 46 States that have adopted a comparative fault system, at least 44 continue to recognize and apply the superseding cause doctrine.

*Exxon Co., U.S.A. v. SOFEC, Inc.*, 116 S.Ct. 1813, 1818 (1996), 517 U.S. 830, 135 L.Ed.2d 113.

The courts of New Mexico, in a manner consistent with *Waste Mgmt., Inc.*, have carefully analyzed and refined intervening cause in negligence cases in the wake of comparative fault:

The doctrine of independent intervening cause did not originate in response to contributory negligence; rather, the doctrine reflects traditional notions of proximate causation and the need to limit potentially limitless liability arising from mere cause in fact. *See generally* Keeton et al., *supra*, § 44, at 302 ("In the effort to hold the defendant's liability within some reasonable bounds, the courts have been compelled, out of sheer necessity and in default of anything better, to fall back upon the scope of original foreseeable risk which the defendant has created."). Independent intervening cause is a question of policy, foreseeability, and remoteness. *See id.* at 301-02; 4 Fowler V. Harper et al., *The Law of Torts* § 20.5, at 147-50 (2d ed.1986). Importantly, the doctrine is thus not limited to the negligent acts of multiple tortfeasors or the negligence of the plaintiff but also may include intentional tortious or criminal acts of third parties as well as forces of nature. As with the sudden emergency doctrine, then, the doctrine of independent intervening cause is not "as clearly incompatible with comparative negligence" as the defenses of last clear chance and open and obvious danger. *Dunleavy*, 116 N.M. at 358, 862 P.2d at 1217.

Nonetheless, to a certain extent, courts have shaped the doctrine of independent intervening cause in response to the harshness of contributory negligence and the potential unfairness of joint and several liability. In this regard, "[t]he doctrine of intervening cause is not so strong as it seems to have been at one time." *O'Brien v. B.L.C. Ins. Co.*, 768 S.W.2d 64, 68 (Mo.1989) (en banc). With respect to contributory negligence, courts have sometimes labeled a defendant's negligent act an independent intervening cause when a plaintiff's negligence would

-20-

have been a complete bar to recovery, even though both acts could be characterized as proximate causes of the injury. *See* Terry Christlieb, Note, *Why Superseding Cause Analysis Should be Abandoned*, 72 Tex. L.Rev. 161, 165-66 (1993). Courts have also relied on the doctrine of independent intervening cause to relieve a defendant of complete liability in situations in which a third party's negligence is grossly disproportionate in causing the plaintiff's injury, even though, again, both acts of negligence may be characterized as a proximate cause of the plaintiff's injury. *See Holden v. Balko*, 949 F.Supp. 704, 708-09 (S.D.Ind.1996) (discussing the relationship of the intervening cause doctrine and the "all-or-nothing" approach of the common-law rule of joint and several liability); Christlieb, *supra*, at 165 (classifying superseding causes under three general types, defining an "absorbing cause" as one "that, for one reason or another, is judged to be much more at fault than the other proximate cause," and stating that this type of superseding cause "has no logical use under comparative [negligence] systems"); *see also Hercules, Inc. v. Stevens Shipping Co.*, 765 F.2d 1069, 1075 (11th Cir.1985) (stating that the doctrine of intervening cause "operated in maritime collision cases to ameliorate the harsh effects of the so-called 'divided damages' rule, under which damages were divided evenly between negligent parties"). We believe that such an expansive application of the doctrine of independent intervening cause to negligent acts is inconsistent with New Mexico's system of pure comparative fault.

*Torres*, 987 P.2d at 392-93.

Following the *Torres* decision, the Court of Appeals of New Mexico in *Chamberland* addressed a factual situation strikingly similar to the case at bar wherein the issue on appeal is framed:

> In this appeal we discuss the elements of independent intervening cause as an affirmative defense and the evidence necessary to justify a jury instruction on it, particularly in light of the limited role our Supreme Court has assigned to independent intervening cause after *Torres v. El Paso Elec. Co.*, 1999–NMSC–029, 127 N.M. 729, 987 P.2d 386. We also discuss the appropriate remedy when the independent intervening cause instruction is given in error. We hold that the jury in this case should not have been instructed on independent intervening cause, and we reverse the defense verdict and remand for a new trial.

27 P.3d at 1020.

Plaintiff Chamberland went to defendant Roswell experiencing abdominal pain and was diagnosed with a urinary tract infection and prescribed antibiotics and pain killers. Chamberland returned to the clinic a week later where examination indicated an inflamed prostate gland which was then treated by further antibiotics. A few days afterwards, Chamberland went to four other doctors unaffiliated with the clinic, none of whom observed the classic symptoms of appendicitis.

Ultimately, Dr. Fachado of Roswell referred him to a urologist for a more comprehensive diagnosis. The urologist, examining Chamberland ten (10) days after his initial visit to Roswell, observed the classic symptoms of appendicitis and referred him to a surgeon for the removal of his appendix. Surgery revealed that the appendix had already ruptured and created a large abscess.

Plaintiffs sued Roswell for malpractice. Over the vigorous objection of Chamberland, the trial court charged the jury with not only the standard proximate cause instruction, but also an instruction on independent intervening cause. The jury returned a verdict for defendant and, on appeal, the Court of Appeals of New Mexico reversed and remanded for a new trial.

Defendants asserted that appendicitis was not detectable during the time that they treated Chamberland, and its intervention thereafter constituted an independent intervening cause. Plaintiffs asserted that the existence of appendicitis predated Chamberland's first visit to the clinic, and the failure of Defendant to diagnose the same was negligent.

The discussion by the New Mexico Court of Appeals is enlightening and informative.

> The relationship between causation in fact and independent intervening cause is critical to our analysis. To establish liability, there must be a chain of causation initiated by some negligent act or omission of the defendant, which in legal terms is the cause in fact or the "but for" cause of plaintiff's injury. *See* UJI 13-305 (encompassing cause in fact within our instruction on proximate cause, defining it as "that ⋯ without which the injury would not have occurred"); see also *Terrel v. Duke City Lumber Co.*, 86 N.M. 405, 423, 524 P.2d 1021, 1039 (Ct.App.1974). As the chain of causation progresses in time or place from the negligent act or omission, an unforeseen force may intervene in the sequence of causation to completely disrupt its normal progression, producing unpredictable injuries. The unforeseeable force, be it a force of nature, an intentional tort, or a criminal act, gives rise to an instruction on independent intervening cause which is an affirmative defense that releases the defendant of all liability. *See Bouldin v. Sategna,* 71 N.M. 329, 333, 378 P.2d 370, 372-73 (1963) (recognizing that the instruction on independent intervening cause comes up when there is a "question of whether the causal connection between defendant's negligence and the injury was ⋯ interrupted").

> An instruction on independent intervening cause presupposes a defendant's negligence and causation in fact. Without some initial tortious act or omission by a defendant that precipitates the plaintiff's ultimate injury, subsequent causes and their injuries cannot "intervene." Without causation in fact, there is nothing for the subsequent cause to "interrupt" or "intervene" in, and no chain of causation to break. *See Kelly v. Montoya,* 81 N.M. 591, 595, 470 P.2d 563, 567 (Ct.App.1970) (observing that an independent intervening cause must "break the natural sequence of the first negligence"). If the evidence demonstrates no more than a simple dispute over causation in fact (i.e., whether the defendant's negligence did or did not cause

-22-

in fact the injuries suffered by the plaintiff), then the issue for the jury is causation alone, not independent intervening cause. *See Torres,* 1999-NMSC-029, ¶ 14, 127 N.M. 729, 987 P.2d 386 (recognizing that the doctrine arose in response to liability based on cause in fact); *see also* W. Page Keeton et al., *Prosser and Keeton on the Law of Torts,* § 44, at 301 (5th ed.1984) (recognizing the problem of [independent] intervening cause "does not arise until cause in fact is established"); Restatement (Second) of Torts §§ 431, 440 (1965) (requiring the defendant's negligent conduct to be a "substantial factor in bringing about the harm" before another cause intervenes); Christlieb, *supra,* at 162 (observing that the doctrine "presupposes the existence of more than one cause in fact"). To our knowledge, no reported New Mexico case has ever authorized the independent intervening cause instruction in the absence of causation in fact.

The present dispute illuminates the distinction between a true independent intervening cause and a mere dispute over causation in fact without an independent intervening cause. In the case before us, only two scenarios were possible in regard to the appendicitis: either it was present at the time Defendants examined Johnny or it was not. If, as the Chamberlands' evidence showed, the appendicitis was present and detectable through the exercise of ordinary care when Defendants examined Johnny, then Defendants were negligent if they failed to exercise reasonable care, and liable for injuries proximately caused if that negligence was a cause in fact of the abscesses and other injuries that followed. On the other hand, as Defendants argued to the jury, if the appendicitis was not reasonably detectable at that point in time (even if it existed in fact), then any negligence in the course of Defendants' examination, record keeping or treatment with respect to Johnny's urinary tract infection, could not have been a cause in fact of Johnny's abscesses and other injuries. According to the undisputed evidence, Johnny's injuries were caused solely by a ruptured appendix and not by any urinary tract infection.

Neither circumstance justifies an independent intervening cause instruction. The dispute gives rise to the standard instruction on proximate cause and no more, because causation in fact is the only issue in dispute other than the quality of Defendants' medical care. Defendants appear to agree that if the jury believed that Johnny had appendicitis when he initially went to the Clinic, then the existence of appendicitis could not be an independent intervening cause of his injuries. *See* Dan B. Dobbs, *The Law of Torts,* § 186, at 461 (2000) ("If the intervening force is in operation at the time the defendant acted, it is not an intervening cause at all.").

Nor does the second possible scenario, that Johnny's appendicitis did not occur until some ten days later, support an instruction on independent intervening cause. If Johnny did not have appendicitis until days after Defendants finished examining him, as they now contend on appeal, then whatever Defendants did or did not do in the course of their medical examinations, record keeping, or treatment of

-23-

the urinary tract infection, bore no causal relationship to Johnny's injuries. As previously stated, Johnny's injuries were caused solely by the ruptured appendix and the resulting abscess, and not from the urinary tract infection. Here again, Defendants' theory goes to the lack of causation in fact, not to an independent intervening cause.

As previously discussed, the independent intervening cause instruction presupposes causation in fact and comes into play only if the evidence shows (1) negligence by a defendant that is a cause in fact, or "but for" cause, of the plaintiff's injury, *see* UJI 13-305, and (2) the intervention of an independent, unforeseeable event that "interrupts and turns aside" the normal progression of that causation in fact, *see* UJI 13-306. Without causation in fact, there can be no independent intervening cause. Therefore, in this case neither evidence nor theory justified instructing the jury on independent intervening cause, and, as in *Torres,* that instruction led to "the interjection of a false issue into the trial." 1999-NMSC-029, ¶ 22, 127 N.M. 729, 987 P.2d 386 (internal quotation marks omitted).

*Chamberland*, 27 P.3d at 1023-24 (footnote omitted)..

In the case at bar, we must determine whether any substantial evidence supported an instruction to the jury on independent intervening (superseding) force. Reported cases in various jurisdictions use in seemingly interchangeable fashion the terms "independent intervening cause", "superceding cause" and supervening cause". The only scenario that could justify such an instruction under the facts of this case is the assertion by Defendant that arachnoiditis can develop as a natural progression of pre-existing degenerative disc disease without regard to any alleged negligence of Dr. Dimick in the first surgery. There is evidence in the record to support such a possibility, but on the other hand, such possibility as to the development of this rare condition is a known possibility which raises foreseeability questions. Under *Waste Mgmt., Inc.* and under the guidance of *Chamberland*, we are dealing not with a jury charge of superseding cause but rather the standard charge on proximate cause. The first issue to be resolved is the causation-in-fact question.

[C]ausation-in-fact issues should be resolved before taking up legal (proximate) cause issues or allocating fault. By structuring the process in this manner, the trier of fact will decide all causation-in-fact issues before determining whether a defendant who might otherwise be liable should be relieved from liability because of the independent and unforeseen conduct of another.

*Waste Mgmt., Inc.*, 15 S.W.3d at 433.

Whether Ms. Godbee's arachnoiditis resulted from the first surgery performed by Dr. Dimick or whether the condition was simply the natural progression of pre-existing degenerative disc disease are issues relating to cause-in-fact in which neither, either, or both may be determined to be causes-in-fact. Such considerations of cause-in-fact then lay the basis for the standard charge as to

-24-

proximate cause but cannot justify a charge on superseding cause. *See Chamberland*, 27 P.3d at 1024: "The dispute gives rise to the standard instruction on proximate cause and no more, because causation-in-fact is the only issue in dispute").

That the standard charge on proximate cause is correct in this case and the charge of intervening cause is incorrect is a clear implementation of the admonition by this Court that: "Intervening cause appears to relate more to legal (proximate) causation than to causation in fact because it does not come into play until after causation in fact has been established." *Waste Mgmt., Inc.*, 15 S.W.3d at 432. Therefore, an instruction on superseding cause is not justified by the record in this case, and the trial court erred in charging the jury as to an inapplicable legal principle. *Ingram v. Earthman*, 993 S.W.2d 611, 636 (Tenn.Ct.App.1998)

C.

Ms. Godbee next challenges that trial court's charge as to honest mistake, again arguing that there was no evidence in the record to support the instruction. Plaintiff's counsel elicited testimony from Dr. Dimick addressing whether he believed that he exercised proper medical judgment in directing Ms. Godbee to undergo spinal surgery. Dr. Dimick testified:

> Q. Now, at this point in time, Doctor, did you think she had had a sufficient amount of nonoperable management to make an intelligible decision as to whether or not you should operate on her?
> A. Yes, sir. I have had people who have had pain from a herniated disc and have elected for surgery after two weeks. I have had people who have elected to have surgery 6 to 12 months later. It is an individualized treatment recommendation.
> Can surgery be done at two weeks, six weeks, eight weeks, six months? Yes. I leave that up to the patient.
> Q. But you recommended the surgical option, didn't you, Doctor?
> A. In my surgical opinion, based on my training and practice, I thought that was the best way for her to return to the activities she wanted to do with the least chance of problems and the best chance of healing.
> Q. And that was your judgment, your choice as to what you thought was best for her?
> A. My recommendations were based on her goals of returning to her activity the fastest way possible, was with surgery, and that is well documented in the surgical literature. I was taught that in medical school, in my residency, in my fellowship, and it's the way that spinal surgeons practice.

Dr. Dimick is not alleged to have been in error in selecting surgical intervention but only in the inadequate performance of such surgery. Dr. Dimick does not defend on the basis of honest mistake.

Ms. Godbee further argues that because Tennessee Code Annotated section 29-26-115(a), which provides the elements that must be proven in a medical malpractice action, fails to mention "honest mistake", a jury charge which includes the term is erroneous. However, in *Patton v. Rose*, 892 S.W.2d 410, 415 (Tenn.Ct.App.1994), the same argument was raised and rejected by this Court. The Court stated:

> Plaintiff's fourth issue for review, as stated in her brief, is:
> 4. The Court erred in charging the jury on "honest" mistake of judgment as follows:
> "I further instruct you that a physician will not be held liable for *honest* mistakes in judgment, but only for the negligent failure to meet the standard required by the profession in the community. A physician does not guarantee the cure of his patients. Presuming careful diagnosis, a physician is not liable for damages resulting from an honest mistake in determining the character of treatment to be administered."
> Plaintiff asserts that the essence of this instruction is that an honest judgment is not merely a duty owed to the patient, but is an absolute bar to liability. We must respectfully disagree. The instruction is premised on a careful diagnosis by the physician in deciding upon or making an "honest" judgment regarding an accepted method of treatment. The instruction as given is a correct statement of the law, and there was no error by the trial court.

*Patton*, 892 S.W.2d at 415.

The instruction on honest mistake was later upheld in *Hurst v. Dougherty*, 800 S.W.2d 183, 185 (Tenn.Ct.App.1990) and in *Dillard v. Meharry Med. Coll.*, No. M2001-02038-COA-R3-CV, 2002 WL 1465957, at *5-6 (Tenn.Ct.App. Jul. 9, 2002). We agree with the reasoning and result in these cases.

The difficulty in applying "honest mistake" in this case is the lack of an evidentiary basis for it. Dr. Dimick denies any mistake, honest or otherwise, and his defense does not envision "honest mistake." The trial court's jury charge on the doctrine of honest mistake provided:

> By undertaking treatment, a physician does not guarantee good result. A physician is not negligent for merely the cause of an unsuccessful result or an error in judgment.
> Injury alone does not raise a presumption of a physician's negligence. It is negligence, however, if the error of judgment or lack of success is due to the failure to have or to use the required knowledge, care, and skill as defined in these instructions.

A physician will not be held responsible for honest mistakes in judgment but only for negligent failure to meet the standard required by the profession in the community.

A physician does not guarantee a cure for his patients. Presuming careful diagnosis, a physician is not liable for damages resulting from an honest mistake in determining the care and the treatment to be administered.

When there are more than one acceptable method of diagnosis or treatment and not one of them is used exclusively or uniformly by all physicians of good standing, a physician is not negligent for selective and accepted methods of diagnosis and treatment that later turns out to be unsuccessful. This is true even if the method is not one favored by certain other physicians.

It is your obligation to determine the recognized standard of acceptable practice in the defendant's profession for this or a similar community.

*Patton v. Rose* and other cases cited are based on a finding that evidence of honest mistake existed in the record. There being no evidence in this record to support such defense, it was error to give the instruction.

D.

Ms. Godbee next asserts that the trial court erred in giving the jury an incomplete instruction on informed consent and by failing to instruct the jury on medical battery. The court's jury charge as to informed consent omitted the last paragraph of Tennessee Pattern Jury Instruction -Civil 6.25, which provides:

In determining how a reasonable patient would have acted under the circumstances, you should consider the testimony of the *[patient] [plaintiff]*, the plaintiff's *[idiosyncrasies]*, *[fears]*, *[age]*, *[medical condition]*, *[and] [religious beliefs]*, the presence or absence of alternative *[procedures] [treatments]* and the potential risks and benefits thereof, and the impact of no *[treatment] [procedure]* on plaintiff's health.

The parties agreed that instead the court would add a paragraph to Tennessee Pattern Jury Instruction – Civil 6.25 from the comment to former Tennessee Pattern Jury Instruction – Civil 6.30. However, the revised instructions which were read to the jury omitted the agreed upon comment to former Tennessee Pattern Jury Instruction – Civil 6.30. Plaintiff submits that this omission constituted reversible error.

Although a party may seek a new trial because of an incorrect instruction, even if it failed to object to the instruction at trial, a party is required to bring the trial court's attention to material omissions in the instructions. *Grandstaff v. Hawks*, 36 S.W.3d 482, 489 (Tenn.Ct.App.2000). Here, Plaintiff failed to direct the court to the omission in the charge when the court provided counsel with a final copy of the instructions prior to reading the instructions to the jury. Plaintiff again failed to

object after the trial court completed charging the jury. Therefore, the error was waived on appeal.

Ms. Godbee additionally challenges the trial court's failure to instruct the jury on medical battery. A medical battery typically occurs when "(1) a professional performs a procedure that the patient was unaware the doctor was going to perform; or (2) the procedure was performed in a part of the body other than that part explained to the patient (i.e., amputation of the wrong leg)." *Ashe v. Radiation Oncology Assoc.*, 9 S.W.3d 119, 121 (Tenn.1999). Plaintiff alleges that Dr. Dimick's decision to approach the herniated disc in her back from the left side instead of the right was equivalent to operating on the wrong limb and therefore she was entitled to an instruction on medical battery.

First, we do not believe that the evidence presented at trial supported an instruction on medical battery. Plaintiff's allegation that Dr. Dimick should have entered from her symptomatic right side instead of her left side does not fall within the narrow area in which physicians may be held liable for battery in their treatment of patients. *See Woolley v. Henderson*, 418 A.2d 1123, 1133 (Me.1980). Ms. Godbee authorized Dr. Dimick to operate on her lumbar in order to remove the herniated disc and alleviate her discomfort. Dr. Dimick's performance of the operation did not substantially differ from that which Ms. Godbee had consented to such that an instruction on medical battery would be applicable. Furthermore, Plaintiff failed to request that such an instruction be given to the jury and therefore regardless of the evidence presented at trial, the issue was waived on appeal.

E.

Ms. Godbee alleges three errors with respect to the jury verdict form. First, Plaintiff contends that it was error for the trial court to omit Plaintiff's claim for medical battery from the verdict form. However, as we explained above, the evidence presented at trial did not support a claim for medical battery, Plaintiff failed to request an instruction on medical battery, and Plaintiff did not object to the absence of the claim on the jury verdict form. Therefore, the alleged omission was waived on appeal.

Ms. Godbee next contends that the structure of the jury verdict form constituted reversible error since it prevented consideration of her informed consent claim in Question #3 if the jury found that Dr. Dimick was not negligent in his treatment of Ms. Godbee in Question #1 and Question #2. The jury verdict form provided in pertinent part:

> We, the jury, unanimously answer the questions submitted by the Court as follows:
> 1. Was Dr. Robert Dimick negligent by deviating from the recognized standard of acceptable professional practice for his profession and specialty in this community in the treatment of Theresa Godbee?
> Yes _____ No _____
> If your answer is "no", stop here, sign the verdict form and return to the Court. If you answer "yes", proceed to Question 2.

-28-

2. Was Dr. Dimick's negligence a proximate cause of injury or damage to Theresa Godbee which would not otherwise have occurred?

Yes _____                        No _____

If your answer is "no", stop here, sign the verdict form and return to the Court. If your answer is "yes", proceed to question 3.

3. Did Dr. Robert Dimick deviate from the recognized standard of acceptable professional practice for his profession and specialty in this community by failing to obtain the informed consent of Theresa Godbee before treatment?

Yes _____                        No _____

Defendant admits that there was potential confusion with respect to the verdict form in that it structurally precluded consideration of Ms. Godbee's lack of informed consent claim if the jury found that Dr. Dimick was not negligent, however, Defendant asserts that the error was not prejudicial since it was promptly corrected by the trial court upon discovery. "When a jury returns an incorrect or imperfect verdict, the trial court has both the power and the duty to send them back to the jury room with directions to amend the verdict and to put it in proper form." *Meade v. State*, 530 S.W.2d 784, 787 (Tenn.Ct.Crim.App.1975). In this case, the court recognized the error and instructed the jury to answer Question #3 which applied to the claim of informed consent despite the contradictory instructions following Question #1 and Question #2. The completed verdict form returned by the jury showed a negative answer to both Question #1 and to Question #3 indicating that the jury understood that they were required to answer both questions. The foreman's recitation of the verdict to the court further supports the lack of prejudicial error resulting from the inadequacies of the verdict form. The foreman stated to the court:

THE COURT:        May the foreman rise and read the verdict to the Court.

MR. PLUMMER:      Your Honor, we the Jury unanimously answer the question submitted by the Court as follows: Was Dr. Robert Dimick negligent by deviating from the recognized standard of acceptable, professional practice for his profession in specialty in this community in the treatment of Theresa Godbee? No.

And you asked that we also answer Question 3. Did Dr. Robert Dimick deviate from the recognized standard of acceptable professional practice for his profession and specialty in this community by failing to obtain the informed consent of Theresa Godbee before treatment? No.

This Court addressed a factually similar issue in *Johnson v. Allstate Ins. Co.*, No. M1999-01639-COA-R3-CV, 2000 WL 1156642, at *13 (Tenn.Ct.App. Aug. 16, 2000), where defendant claimed that an incorrect jury verdict form confused the jury causing reversible error. The Court held that while the trial court erred in formatting the verdict form, such error was not prejudicial since the court promptly cured the defect. *Johnson*, 2000 WL 1156642, at *13. This Court stated:

Allstate asserts that the trial court erred in giving an incorrect instruction to the jury on the jury verdict form itself. The instruction erroneously stated that if the jury answered Question No. 2 "no," then they should go directly to Question No. 4. The court noticed this error after the jury came back leaving Question No. 3 unanswered. When the court noticed the error, he reinstructed the jury that they needed to respond to Question No. 3 regardless of what answer they had given to Question No. 2. The jury left and after further deliberation answered Question No. 3.

The trial court properly instructed the jury and sent the jury back to complete the jury verdict form. We find no prejudice to Allstate in this inadvertent error which was promptly corrected by the court upon discovery. This issue is without merit.

*Johnson*, 2000 WL 1156642, at *13.

However, Plaintiff cites *Manley v. Auto. Ins. Co. of Hartford, Conn.*, 169 S.W.3d 207, 214-15 (Tenn.Ct.App.2005), in support of her contention that the faulty verdict form constituted reversible error. In that case, the court stated that "[a] new trial is ... warranted when verdict forms are composed in such a faulty fashion that they do not address each of the plaintiffs' theories of recovery and do not allow the jury to adequately respond to each claim." *Manley*, 169 S.W.3d at 214-15. However, the court went on to explain that "[w]ell-settled law requires courts to construe the terms of a verdict in a manner that upholds the jury's findings, if it is able to do so. *See Briscoe v. Allison*, 200 Tenn. 115, 125-126, 290 S.W.2d 864, 868 (1956). Even if a verdict is defective in form, it is to be enforced if it sufficiently defines an issue is such a way as to enable the court to intelligently articulate a judgment. *See Arcata Graphics Co. v. Heidelberg Harris, Inc.*, 874 S.W.2d 15, 22, 27 (Tenn.Ct.App.1993). *Id.* at 911." *Manley*, 169 S.W.3d at 215.

Although we find that the verdict form in this case was defective, we do not believe that the form's shortcomings resulted in reversible error. The verdict sufficiently conveyed the jury's decision on the issue of informed consent as evidenced by the form itself and the foreman's recitation of the verdict to the court. Furthermore, much like the court in *Johnson,* the trial court promptly instructed the jury to answer Question #3 pertaining to informed consent despite the contradictory statements following Question #1 and Question #2. We therefore find that Plaintiff incurred no prejudice in the structural inadequacies of the jury verdict form.

Ms. Godbee finally asserts that the substance of Question #3 on the verdict form provided the jury with an inadequate statement of the law on informed consent. Specifically, Plaintiff claims that Question #3 failed to clearly explain that a physician lacks informed consent when he does not provide a patient with all required information. According to Ms. Godbee, Question #3 should have read:

-30-

Did Dr. Robert Dimick deviate from the recognized standard of acceptable professional practice for his profession and specialty in this community by failing to obtain the informed consent of Theresa Godbee before treatment either (a) by failing to disclose alternative treatments available or (b) by failing to disclose that information about the proposed treatment and its attendant risks sufficient to enable the patient to make an intelligent decision about whether to undergo treatment?

However, it appears from the record that the court clearly instructed the jury during the charge that a physician is liable under the doctrine of informed consent when he fails to provide a patient all required information about treatment. The charge specifically provided:

A physician has a duty to give a patient certain information before treating that patient. The information that a physician must disclose is that information about treatment involved and its intendant risk to enable the patient to make an intelligent decision about whether to undergo treatment.

"[W]here the trial court's instructions clearly and definitely set forth the elements upon which liability must be based, the failure to recite each element in the verdict form will not render the verdict invalid." *Pomeroy v. Ill. Cent. R.R. Co.*, No. W2004-01238-COA-R3-CV, 2005 WL 1217590, at *3 (Tenn.Ct.App. May 19, 2005); *State v. Faulkner*, 154 S.W.3d 48, 62 (Tenn.2005). Because in this case, the court's instructions clearly and definitely stated the elements upon which liability in an informed consent action must be based, we cannot find that the failure to list such elements in the jury verdict form was reversible error.

### V. Jury Verdict

The fifth error raised by Ms. Godbee on appeal concerns whether the verdict rendered by the jury was contrary to the greater weight of the evidence. This alleged error presents no issue on appeal since Tennessee Rule of Appellate Procedure 13(d) provides in relevant part: "Findings of fact by a jury in a civil actions shall be set aside only if there is no material evidence to support the verdict." We therefore find no error in the verdict and judgment in favor of Dr. Dimick.

### VI. Letter From Dr. Landman

Ms. Godbee next asserts that the trial court erred in admitting into evidence an open opinion letter from a physician who was not present to testify. During the trial, the court allowed Defendant to introduce an open letter into evidence from Dr. Jeffery Landman, Dr. Metzman's partner. The letter was written a year after Ms. Godbee's surgery and stated in pertinent part, "I was asked to

review the MRI scan on this patient dated 11-1-94 ... I believe I would have read the scan essentially the same as Dr. Metzman." The letter was introduced without the presence of Dr. Landman and used to bolster Dr. Dimick's position that he was not negligent in his assessment of Ms. Godbee's MRI scan. Ms. Godbee argues that the open letter was inadmissible hearsay.

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." T.R.E. 801(c). Hearsay is not admissible except as provided by the Tennessee Rules of Evidence or some other law. T.R.E. 802. Dr. Landman's letter was clearly hearsay since it consisted of a statement made by Dr. Landman other than while testifying at trial, in which the doctor's statement that he would have interpreted the MRI scan the same as Dr. Metzman was being used to establish that Dr. Dimick's interpretation of the MRI was correct.

However, Defendant submits that Dr. Landman's letter was admissible as an exception to hearsay under the business record exception found in Tennessee Rule of Evidence 803(6). Tennessee Rule of Evidence 803(6) requires that the excepted record of an opinion or diagnosis be "made at or near the time" of the occurrence set forth in the document. The letter in this case however, is clearly dated one year after Ms. Godbee's original diagnosis by Dr. Dimick. Furthermore, Defendant's contention that the letter was self-authenticated under Tennessee Rule of Evidence 902(11) is likewise without merit since 902(11) also requires the document be "made at or near the time of the occurrence of the matters set forth." Defendant finally complains that Plaintiff's election to forego deposing Dr. Landman despite knowledge of the letter and notice of Dr. Dimick's intent to use the letter at trial, renders Plaintiff's objections moot. However, Plaintiff's decision to forego deposing Dr. Landman does not relieve the burden on the proponent of a hearsay statement from justifying the admission of the statement as an exception to hearsay. *See State v. Lewis*, No. M2004-02255-CCA-R3-CD, 2006 WL 684590, at *5 (Tenn.Crim.Ct.App. Mar. 15, 2006). We therefore find that the trial court erred in admitting Dr. Landman's letter into evidence.

## VII. DR. SCHOETTLE'S TESTIMONY

Ms. Godbee finally claims that the trial court erred in excluding portions of Dr. Timothy Schoettle's deposition related to the standard of care and in failing to direct that the entirety of Dr. Schoettle's video deposition be played into evidence. The court entered a pre-trial order on January 25, 2005, that addressed which portions of Dr. Schoettle's deposition testimony would be admissible at trial. The order provided that Dr. Schoettle could offer standard of care testimony as long as it was stated within a reasonable degree of medical certainty. Ms. Godbee argues that the trial court erroneously excluded testimony from Dr. Schoettle in which he explained the standard of care within a reasonable degree of medical certainty. The contested excluded portions provided:

A.    ...And following that general principal, then, my approach, and the generally accepted approach, would be to examine and approach things from the symptomatic side if the goal was to do surgery on one side only and to avoid having to do muscle disection and surgery on two sides and I think that would be the generally accepted approach by neurosurgeons and orthopaedic surgeons in the Middle Tennessee area. I am not certain if doing the approach that was taken would fall in the category of being a violation of the standard of care, but it would be a unique approach or a different approach than taken by the majority of people facing this type of clinical problem.

Q.    And in this particular situation, again, Dr. Dimick attempted to address problems on the right side by performing surgery on the left side apparently. And so based on that, is it your testimony that the generally accepted practice, or would you say the standard accepted practice, would be to perform such surgery from the right side instead of the left side as Dr. Dimick did?

...

A.    I would characterize my answer as being the generally accepted practice would be to approach this type of problem from the symptomatic right side and not from the left.

...

A.    ...I believe in my practice and in the practice of most spinal surgeons in Middle Tennessee that if that approach is chosen and one feels that a good surgery can be performed from one side that the generally accepted approach would be to approach it from the symptomatic side and not from the asymptomatic side period.

"'Recognized standard' means a standard recognized and accepted generally by the profession and not merely the particular standard of a single practitioner or group. The testimony of a physician as to what he would do or his opinion of what should have been done does not prove the statutory standard of medical practice. *Lewis v. Hill,* Tenn. App.1988, 770 S.W.2d 751." *Crawford v. Family Vision Center, Inc.*, No. 01-A-01-9005CV00184, 1990 WL 177351, at *2 (Tenn.Ct.App. Nov. 16, 1990). Furthermore, "what 'a majority of physicians in a community would consider to be reasonable medical care in that community' is not the meaning of standard of care.

If this were the case, it would require a poll of physicians practicing in a community to determine the standard of care. The standard of care is determined by whether a physician exercises the reasonable degree of learning, skill, and experience that is ordinarily possessed by others of his profession. *See Hurst v. Dougherty*, 800 S.W.2d 183 (Tenn.App.1990)." *Hopper v. Tabor*, No. 03A01-9801-CV-00049, 1998 WL 498211, at *3 (Tenn.Ct.App. Aug. 19, 1998).

We believe that the court properly excluded that part of Dr. Schoettle's testimony regarding the practice of "most spinal surgeons" as it is settled that the practice of the majority of physicians in a community is not analogous to the standard of care in a community. However, the remaining

excerpts of Dr. Schoettle's testimony refer to the "generally accepted approach" and the "generally accepted practice" which we believe is consistent with the standard of care. Therefore, we find that it was error for the trial court to exclude these portions of Dr. Schoettle's testimony from the record.

Ms. Godbee next argues that the trial court erred in allowing Defendant to selectively play portions of Dr. Schoettle's video deposition rather than playing the video deposition in its entirety and in prohibiting Plaintiff from playing the balance of the video deposition not played by Defendant. On January 18, 2005, Plaintiff called Dr. Schoettle as a witness and played the direct examination of his video deposition into the record. Defendant thereafter began playing the cross-examination of the witness. After approximately four pages of cross-examination, Defendant sought to redact Dr. Schoettle's cross-examination testimony in order to prevent redundant testimony. Despite Plaintiff's objections, the court continued the cross-examination of Dr. Schoettle until the following day in order to provide Defendant time in which to redact his cross-examination of the witness.

On January 19, 2005, instead of redacting his cross-examination of Dr. Schoettle, Defendant sought to waive his cross-examination of the physician altogether in order to prevent any further testimony from the witness being entered into evidence. Plaintiff then sought clarification from the court concerning whether she would be allowed to enter one or two additional statements from Dr. Schoettle's redirect if Defendant was permitted to waive further cross-examination of the witness. The court determined that Defendant was entitled to waive further cross-examination of Dr. Schoettle and allowed Plaintiff to read the requested redirect testimony. Plaintiff argues that the exclusion of the balance of the deposition was error.

> [T] he general rule is that when a deposition has been properly taken and filed in the court, either party may introduce all or any competent and relevant parts of it which are not clearly fragmentary and misleading, and the opposing party may put in evidence any other part which would be proper as cross-examination, if the testimony had been given by the witness on the stand. Thus, it has been held that, even though the deposition was taken at the instance of the party offering it, he or she need not introduce all of it.
>
> The adverse party, however, may read or call for the reading of so much of the balance of the deposition as is relevant and pertinent.

26B C.J.S. *Depositions* § 113 (2001).

Clearly, Plaintiff's contention that Defendant was bound to read the entirety of Dr. Schoettle's cross-examination is without merit. Defendant had the right to select the portions of Dr. Schoettle's testimony which he found competent and relevant while excluding the other portions of

the testimony. However, Plaintiff also had the right to read the relevant and pertinent portions from the balance of the deposition. Plaintiff chose not to exercise this right but rather decided to recite into evidence only a portion of the unread balance of the deposition. Counsel for Plaintiff stated:

> MR. BEDNARZ:     Judge, if he waives it, then I'm not going to play all that stuff, but I need to bring in one or two statements that are critical because you are ruling on an affidavit coming in.
>
> ...
>
> MR. BEDNARZ:     This is where he said – and this is all I wanted to read in is where he said, when I gave that affidavit, I had not looked at the film itself. That's all.

A plaintiff cannot "take advantage of errors which he himself committed, or invited, or induced the trial court to commit, or which were the natural consequence of his own neglect or misconduct." *Norris v. Richards*, 246 S.W.2d 81, 85 (Tenn.1952) (emphasis omitted). It was Plaintiff's own calculated decision not to read the balance of the deposition into the record. We therefore find that the trial court committed no error in the exclusion of the balance of Dr. Schoettle's deposition which the parties chose not to read into evidence.

## VIII. DOCTRINE OF ESTOPPEL

Defendant's sole contention on appeal is that Plaintiff's admittedly false and misleading responses provided during discovery regarding her physical condition, use of medications and medical examinations should bar her claim against Dr. Dimick under the doctrine of estoppel and unclean hands. Ms. Godbee's lack of credibility may very well have provided a valid basis for the jury's verdict for Dr. Dimick and she will undoubtedly face this significant obstacle once again should this case be retried. However, after our examination of the record, we cannot in good conscience conclude that the errors with regard to (1) the submission of the medical articles to the jury, (2) the exclusion of Dr. Schlachter's rebuttal testimony, (3) the unwarranted instructions on superseding cause and honest mistake, (4) the admission of Dr. Landman's letter, and (5) the inappropriate limitation on Dr. Schoettle's testimony did not substantially affect the jury's verdict notwithstanding Ms. Godbee's patent credibility problems.

## IX. CONCLUSION

This Court is much indebted to the parties for their carefully crafted briefs and oral arguments in this case. For reasons herein stated, the judgment of the trial court is reversed and the case is remanded for a new trial. Costs are assessed to Appellee.

_____

WILLIAM B. CAIN, JUDGE